# STATE OF MICHIGAN

# COURT OF APPEALS

SONYA RENE MILLER,

Plaintiff-Appellee,

v

GARY JOHN PLUMMER,

Defendant-Appellant.

UNPUBLISHED
July 28, 2015

No. 325411
Washtenaw Circuit Court
Family Division
LC No. 13-001222-DM

Before: SAWYER, P.J., and DONOFRIO and BORRELLO, JJ.

PER CURIAM.

Defendant appeals as of right the trial court's judgment of divorce awarding plaintiff sole physical and legal custody of the parties' children, LP and RP, while granting defendant parenting time on alternating weekends and holidays. On appeal, defendant argues that the trial court erred in awarding plaintiff sole physical and legal custody when the children shared an established custodial environment with both parties and plaintiff did not offer clear and convincing evidence that a change in custody served the children's best interest. For the reasons set forth in this opinion, we affirm.

## I. BACKGROUND

This appeal arises from a contentious custody battle between the parties. Prior to the filing of divorce, the parties shared in the parenting of their two minor children. Because both parties worked, plaintiff as a doctor and defendant as a tile worker, the parties retained nannies to assist with the household chores and tending to the needs of the children. In December 2012, plaintiff first filed for divorce, however the parties reconciled and defendant agreed to attend counseling and to work on his discipline with the children which had been deemed by plaintiff to be lax. Following several months of attempted reconciliation, plaintiff again filed for divorce in May 2013.

The trial court entered an interim order granting joint legal and physical custody of the minor children. The parties continued to live together in the marital home until it sold, however, by June of 2013, events began to unfold that called into question the capacity of the parties to co-parent. Testimony revealed that defendant undertook numerous actions that led to (1) one of the minor children being removed from daycare, (2) locking plaintiff and her parents out of the marital home on numerous occasions, (3) having nannies leave the employ of the parties due to

-1-

defendant's actions, (4) the necessity of police intervention to allow plaintiff and her parents into the marital home, (5) taking actions which undermined plaintiff's professional life, (6) making unfounded allegations about plaintiff to Child Protective Services (CPS) about plaintiff and her parents, and (7) one of the minor children resenting plaintiff and developing an anxiety disorder to such an extent that the minor child began defecating in their pants.[1]

On December 18, 2014, the trial court issued its opinion, finding, in relevant part, that the children had an established custodial environment with both parties. The trial court then concluded that joint custody was not appropriate, however, because the parties could not "effectively communicate with one another and, specifically could not agree" on issues such as daycare, psychological treatment, discipline and religion. The trial court named defendant as "the primary actor creating the conflicts between the parties and generating the drama that plays out in front of, or involving, the children." Regarding best interests, the trial court found that pursuant to MCL 722.23, factors (a), (b), (e), (f), (h), (i), (k), and (l) weighed equally in favor of both parties, while plaintiff was favored under factors (c), (d), (g), and (j). The trial court awarded plaintiff sole physical and legal custody and granted defendant parenting time on alternating weekends and holidays. Following a clarification of its prior order, this appeal then ensued.

II. STANDARDS OF REVIEW

Child custody orders are subject to three standards of review. *Brausch v Brausch*, 283 Mich App 339, 347; 770 NW2d 77 (2009). All custody orders must be affirmed unless the trial court's findings of fact were against the great weight of the evidence, the court made a clear legal error, or the court committed an abuse of discretion. MCL 722.28; *McIntosh v McIntosh*, 282 Mich App 471, 474-475; 768 NW2d 325 (2009). A trial court's factual findings are against the great weight of the evidence if the facts clearly preponderate in the opposite direction. *Shade v Wright*, 291 Mich App 17, 21; 805 NW2d 1 (2010). Where the evidence conflicts, this Court defers to the trial court's determinations of credibility. *McIntosh*, 282 Mich App at 474. The abuse of discretion standard applies to the trial court's decision to award custody to a particular party. *Berger v Berger*, 277 Mich App 700, 705; 747 NW2d 336 (2008). An abuse of discretion occurs when "the trial court's decision is so palpably and grossly violative of fact and logic that it evidences a perversity of will, a defiance of judgment, or the exercise of passion or bias." *Id*.

"The Child Custody Act, MCL 722.21 *et seq*., governs custody disputes. The act is intended to promote the best interests of children, and it is to be liberally construed." *Berger*, 277 Mich App at 705, citing MCL 722.26(1). As a threshold matter in custody cases, the trial court must determine whether the children have an established custodial environment with one or both parents. See MCL 722.27(1)(c). At the time of the evidentiary hearings to determine child custody, plaintiff and defendant shared joint physical and legal custody of their children under an interim order. The trial court found that an established custodial environment existed with both

---

[1] These are merely a summation of events which occurred during the pendency of the divorce. Other events shall be detailed below when relevant to the trial court's analysis.

parties. See *Berger*, 277 Mich App at 707 ("A custodial environment can be established as a result of a temporary custody order[.]") Defendant requested that the trial court continue the joint custody arrangement while plaintiff sought sole physical and legal custody. Plaintiff therefore bore the burden to prove by clear and convincing evidence that a change granting her sole physical and legal custody served the children's best interest. *Foskett v Foskett*, 247 Mich App 1, 6; 634 NW2d 363 (2001).

## III. PHYSICAL CUSTODY

"In making a custody determination, a trial court is required to evaluate the best interests of the children under the 12 statutorily enumerated factors." *Kessler v Kessler*, 295 Mich App 54, 63-64; 811 NW2d 39 (2011), citing MCL 722.23. The trial court found that factors (a), (b), (e), (f), (h), (i), (k), and (l) were neutral, weighing equally in favor of neither, or both parties, while factors (c), (d), (g), and (j) weighed in favor of plaintiff. Defendant does not challenge the trial court's findings on any individual factor, or argue that the trial court abused its discretion in awarding plaintiff sole physical custody. Rather, defendant broadly asserts that "the evidence offered to prove that sole physical custody is in the best interest of the [m]inor [c]hildren does not rise to the level of clear and convincing," because the events cited by the trial court in support of its custody decision occurred early in the divorce proceedings. According to defendant, "[t]he record shows that the parties' relationship was improving, [and] they had become better able to co-parent," as the case progressed. Our review of the record evidence presented to the trial court does not support defendant's arguments.[2]

As an initial matter, defendant is incorrect suggesting that the parties' relationship had improved over time. In weighing factor (d), which relates to the length of time the children have lived in a "stable, satisfactory environment, and the desirability of maintaining continuity," MCL 722.23(d), the trial court explained that maintaining joint physical custody was contrary to the children's best interest because the conflict between the parties had increased, rather than decreased:

> . . . The Court finds that it is not desirable, nor in the children's best interest, to continue the shared possession arrangement. The earlier order was temporary, was agreed upon by the parties prior to this trial and is not binding on this Court as a final order.
>
> The Court notes that over time conflict between parties typically lessens. In this case, however, when Plaintiff announced her intent to divorce Defendant (initially in November 2012 and then officially in Spring 2013), conflict between the parties, primarily initiated by Defendant, increased and has not abated. The

---

[2] Defendant does not challenge the trial court's finding that plaintiff was favored under factor (c), the "capacity and disposition of the parties" to provide their children with "food, clothing, medical care or other remedial care." MCL 722.23(c). Further, unlike factors (d), (g), and (j), factor (c) is unrelated to defendant's argument that the trial court should not have relied on past instances of conflict between the parties. We therefore do not address factor (c).

testimony of the witnesses and the messages on [the trial court's communication website] ourfamilywizard.com support such a conclusion. Continuing shared possession does not serve the children's best interests and Plaintiff is favored on this factor.

The trial court had ordered the parties to communicate through ourfamilywizard.com. Defendant's messages to plaintiff on ourfamilywizard.com were not stale evidence. They were written in May 2014, contemporaneous with the evidentiary hearings, and revealed continued animosity towards plaintiff:

> I don't know why you insist on trying to poison LP with that ham you want him to eat all the time now, but if it is true what LP told me, you've got some major problems going on. LP said you made him eat his sandwich from school trip to [the] zoo that he did not eat. Is that true? Wait, you won't tell the truth anyway. I'm not asking, I am telling you do not feed him ham that has been in heat all day unless you want him sick.

> \* \* \*

> I can't believe that you were so busy not to come see LP read at church. He did great. I was going to share a video with you but I have decided to see if you can change your ways and we as parent[s] of two great kids can see to forget whatever you think I did wrong and work together. We have a lifetime to work together with [our] kids. I don't know, I don't want a hug, a win, a kiss or even a[n] F U[3] . . . But fake it like you did when we were married and get along for kids and not about you [sic].

> \* \* \*

> . . . I will be taking care of your lies with the court system, put everything on [the] calendar. That's how it goes. And why does it only have to be your days too late on whatever you and your friend were trying to do. It's funny you send this when I contact Goldfish [where the minor children take swimming lessons] to find out, K[] tells me they can't tell me what days [the] kids come and go. . . . Now you send this like you are so nice and thoughtful. You make me sick with these lies over and over. Go get some help. All you can hurt is our kids. Yes, our kids, not me. I am done with the hurt now. You just make me sick. God can see what the rest can't. You should take my grandma's Bible and ask for help from it or maybe church would help.

The record also reveals that defendant interfered with plaintiff's parenting time as the hearings were ongoing. After the March 31, 2014 evidentiary hearing, plaintiff was scheduled to

---

[3] Plaintiff understood the "FU" to mean "f--- you." Defendant later admitted that plaintiff attended the event referenced in this message.

-4-

give a dental hygiene discussion at Wayne County District Community College Northwest in Detroit. Since her parenting time began that same afternoon, plaintiff arranged for her mother to pick one of the minor children up from daycare and drive the other minor child to his appointment with his psychologist. Plainitff's mother had previously picked up the minor child from day care, yet on the day of plaintiff's presentation, when plaintiff's mother presented her identification and asked for the minor child, the daycare center refused to release her, explaining that plaintiff's mother's name had been removed from the pick-up list. The owner of the day care center, Karen Kozkowski testified, and defendant admitted, that he had asked for plaintiff's mother to be removed from the list because he "did not approve of [plaintiff's mother] picking up [the minor child]." Because plaintiff's mother could not take the minor child home, plaintiff drove from Detroit to Saline to the day-care center in order to get her minor child. As a consequence, plaintiff missed her presentation and the other minor child missed his appointment with the psychologist.

Additionally, the record reveals that during the six month period between the end of the evidentiary hearings and the December 19, 2014 judgment of divorce, the conflicts continued, with plaintiff and defendant filing 11 competing motions against each other, demonstrating their inability to agree on issues such as daycare, medical treatment, and times and locations for parenting time exchanges, without a court order. Accordingly, our review of the record evidence presented leads this Court to conclude that the trial court's findings that the parties' disputes had increased, rather than decreased, were well-founded.

Regarding the more specific claim, defendant is correct in pointing out that a number of the events mentioned in the trial court's custody ruling took place in the summer of 2013, roughly a year before the evidentiary hearings. But the timing of these events does not render them irrelevant to the best interest determination or harmless to the minor children. For instance, factor (g) relates to the "mental and physical health of the parties involved." MCL 722.23(g). The trial court found that factor (g) favored plaintiff in part because "[p]laintiff's mental health appears to be superior to [d]efendant's as she can clearly regulate her emotion." Though defendant argues otherwise, the trial court was not required to overlook prior events that demonstrated his lack of emotional maturity. On the morning that plaintiff was scheduled to take a trip to California, defendant refused to let her take the children with her and chased her around the kitchen. Plaintiff had to call for police assistance and defendant cried in front of the children so loudly that a neighbor intervened. Defendant locked plaintiff and her parents out of the marital home multiple times, including at least once in front of the children, requiring plaintiff to call the police on several occasions and request a "civil standby" to enter her own home. He engaged in intimidating conduct such as blocking plaintiff's way as she tried to drive out of a coffee shop and threatening to "run [her] a-- down." Further, defendant admittedly destroyed or disposed of plaintiff's personal property, including items of significant sentimental value, and likely damaged her engagement ring.

In addition to factor (g), defendant's past conduct was also relevant to the resolution of factor (j), which is the "willingness and ability of the parties to facilitate and encourage a close and continuing parent-child relationship between the child and the other parent[.]" MCL 722.23(j). Significant evidence supported the trial court's finding that this factor "clearly favored" plaintiff, based on its concern that defendant had "tried to enlist [LP] as an ally in a campaign to scourge [p]laintiff, or her relationship with the children."

According to his own mother, one of defendant's "favorite sayings" is that he would like to "pull [plaintiff's] head off." On one of the occasions that plaintiff had to request police assistance to enter her own home, defendant remarked to a police officer, while the children were present, that it "wasn't worth it to waste a bullet on [plaintiff]." Psychologist Dr. Joshua Ehrlich, who evaluated the parties and their children, testified that defendant was "extremely furious" at plaintiff, while "showing no capacity to reflect on his own role in the deteriorating situation[.]" Defendant's emotions wore on then six-year-old LP, who was so "overwhelmed with anxiety and fear," that he had begun defecating in his pants. In discussions with Ehrlich, LP copied defendant's efforts to "paint[] [plaintiff] in the worst possible light," by claiming that she was "lying to the court," and expressing outrage against plaintiff "in the sense that his mother was no longer his mother[.]" On Ehrlich's recommendation, LP was seeing a psychologist four times a week in order to repair his relationship with plaintiff, though defendant opposed this counseling. Consistent with Ehrlich's findings, when the trial court interviewed LP at defendant's request, it determined that "[LP] had been coached or instructed on what to say/ask/do by [d]efendant, or someone on [d]efendant's behalf."

The record also supports the trial court's finding that defendant involved the children in his efforts to harm plaintiff. On the day before plaintiff was scheduled to leave the country for a business trip, defendant called CPS with an abuse complaint, alleging that plaintiff had "pinched" or "hurt" RP's "private area," and that plaintiff's father had punched LP with his fists. However, CPS concluded that the allegations were unsupported and the trial court agreed. Defendant's complaint appeared purposefully timed to interrupt plaintiff's trip and her plan to have her father watch the children, which was against defendant's wishes. Defendant did not inform CPS that RP had a history of vaginal discomfort, or that the minor child had been treated for a urinary tract infection days before she allegedly complained that her "private area" was sore. LP had no bruises or other physical injuries, and in his interview with CPS worker Michelle Johnson, LP did not confirm that plaintiff's father had punched or hurt him. Instead, LP told Johnson that there was a "team mom" and a "team dad," and that he had been encouraged by defendant's friends to be on "team dad." Defendant also refused to turn the children over to plaintiff's father during her parenting time as directed by the friend of the court, even after CPS told him to follow the court's orders. Defendant later admitted that he made the CPS complaint against the advice of counsel. Under these circumstances, the trial court could reasonably conclude that defendant "had absolutely no basis to support his concern for the alleged abuse." Further, since the trial court was in the best position to determine credibility, *Berger*, 277 Mich App at 7-8, we find no error in the trial court's belief that "[a] parent so willing to jeopardize a child's well-being by putting a child through such an invasive interview process . . . loses any benefit of the doubt when the Court considers all of the evidence in determining the applicable best interest and parenting time factors."

In short, the trial court did not err in considering the parties' prior, and ongoing, acrimonious relationship in its best interest analysis. The best interest ruling on factors (d), (g), and (j) was not against the great weight of the evidence. The trial court did not abuse its discretion in awarding plaintiff sole physical custody.

IV. PARENTING TIME

-6-

Defendant next argues that the trial court erred in limiting his parenting time to every other weekend. We note that this claim is not properly presented on appeal, as defendant did not separately identify parenting time as a question presented. See MCR 7.212(C)(5); see also *Brausch*, 283 Mich App at 351. A party's failure to properly identify an issue in the statement of questions presented waives the issue for appellate review. *Michigan's Adventure, Inc v Dalton Twp*, 290 Mich App 328, 337 n 3; 802 NW2d 353 (2010). Nevertheless, because we deem this matter in need of finality, we address defendant's claim.

Parenting time orders are reviewed de novo. *Borowsky v Borowsky*, 273 Mich App 666, 688; 733 NW2d 71 (2007). However, a parenting time order should be affirmed "unless the trial judge made findings of fact against the great weight of the evidence or committed a palpable abuse of discretion or a clear legal error on a major issue." MCL 722.28; see also *Borowsky*, 273 Mich App at 688. "The child's best interests govern a court's decision regarding parenting time." *Shade*, 291 Mich App at 31, citing MCL 722.27a(1). The statutory best interest factors in MCL 722.23, and the factors listed in the parenting time statute, MCL 722.27a(6) are both relevant to the trial court's parenting time decision. *Id.*

After determining that it was in the children's best interest to award plaintiff sole physical and legal custody, the trial court analyzed the parenting time factors under MCL 722.27a(6), and concluded that factors (a) and (i) favored plaintiff, while the remaining factors favored neither party. Defendant challenges only factor (a), which involves "[t]he existence of any special circumstances or needs of the child." MCL 722.27a(6)(a). Regarding factor (a), the trial court stated:

> . . . Here, [LP] has been negatively impacted by the divorce. He was defecating in his pants and is seeing a child psychoanalyst four times/week [sic]. Plaintiff is favored on this factor.

Defendant argues that "[i]t is unclear how [p]laintiff is favored on this factor, when both [p]laintiff and [d]efendant have sought help for [LP], and [d]efendant's only object[ion] . . . was that the particular doctor . . . was not covered by the parties' insurance plan." Again, the record evidence reveals otherwise. Defendant first cited cost as the reason he disagreed with LP seeing child psychologist Dr. Michael Singer for therapy, but later admitted that plaintiff pays for all of LP's therapy sessions, while also insisting that LP has "absolutely no problem," and does not require counseling. He dismissed the fact that LP was defecating in his pants as a "nervous problem." Ehrlich identified defendant as the primary source of LP's distress and anxiety. LP was repeating defendant's accusations and insults against plaintiff. Plaintiff, by contrast, was paying for LP's therapy and had her own sessions with Singer twice monthly, demonstrating her commitment to improving LP's mental health. For these reasons, and those stated in the best interest analysis, the evidence supported the trial court's finding that LP's psychological condition was a special circumstance which plaintiff was best equipped to address. Accordingly, the trial court's findings on factor (a) were not against the great weight of the evidence.

## V. LEGAL CUSTODY

Defendant's final claim on appeal is that the trial court erred in awarding plaintiff sole legal custody. Like physical custody, the question of legal custody is analyzed under the best

interest factors of MCL 722.23, but in view of "[w]hether the parents will be able to cooperate and generally agree concerning important decisions affecting the welfare of the child." See MCL 722.26a(1)(a) and (b). "At the request of either parent, the court shall consider an award of joint custody, and shall state on the record the reasons for granting or denying the request." MCL 722.26a(1). Defendant requested joint physical and legal custody, and does not dispute that the trial court stated its reasons for denying that request, identifying the continued conflict between the parties, "primarily initiated by [d]efendant," as the barrier to a joint custody arrangement.

Defendant contends, however, that the trial court's decision was based on "perceived," rather than actual, disagreements between the parties concerning daycare, discipline, religion, and medical concerns. Again, the record evidence belies this claim. Defendant and plaintiff wanted RP to attend different daycare services. Plaintiff was consistent with setting behavioral boundaries for the children, while defendant was lax, "letting months go by with no meaningful discipline" after LP stole some rocks from a tourist shop, and allowing LP and RP to go to sleep as late as they wanted, and often in his own bed.

But the most compelling evidence supporting the trial court's conclusion that joint legal custody was untenable was the fact that the parties were unable to agree on decisions affecting the children while under the joint legal custody arrangement established by the interim order. Defendant admittedly had the children baptized in the Catholic Church without plaintiff's permission or knowledge following entry of the interim order. He also twice took the children out of school to go on vacation up north over plaintiff's objection. Plaintiff wanted LP to continue counseling with Singer, while defendant preferred that LP see a different psychologist, or receive no counseling at all. Plaintiff also disagreed with defendant's decision to schedule medical tests for LP that she believed were unnecessary. By May 2014, the parties had operated under a joint legal custody arrangement for nearly a year, and yet, according to defendant's messages on ourfamilywizard.com, he could not agree with plaintiff regarding the type of food LP should eat. The parties' continued filings in the lower court after the custody hearings further demonstrate that they could not reach an agreement on even minor matters, such as the location and time of parenting exchanges, without court intervention. Defendant's suggestion that the trial court imagined or exaggerated these disagreements strains credulity. Where, as here, the record "reflects a deep-seated animosity between the parties and an irreconcilable divergence in their opinions about how to foster each child's well-being," joint legal custody is "not an option[.]" *Wright v Wright*, 279 Mich App 291, 299-300; 761 NW2d 443 (2008).

Defendant's final argument, that the trial court should have considered an alternative joint legal custody arrangement wherein "one party is designated as the primary parent" who consults with the "non-primary parent," but has final decision-making authority when the parties cannot agree, is also without merit. Defendant did not request such an arrangement in the lower court and, in any event, "the Legislature did not intend to provide joint-custody arrangements [under MCL 722.26a(1)(b)] if important decision making authority is apportioned between the parties." *Dailey v Kloenhamer*, 291 Mich App 660, 671; 811 NW2d 501 (2011), citing *Shulick v Richards*, 273 Mich App 320, 327-329; 729 NW2d 533 (2006) (the trial court erred in awarding joint legal custody with a "fallback" provision giving the plaintiff responsibility for educational decisions and the defendant responsibility for health decisions in the event that the parties could not agree on those issues).

-8-

Our review of the record leads us to conclude that the trial court made extensive findings of fact and well-reasoned conclusions of law. Contrary to defendant's assertions, the trial court provided both parties with an equal opportunity to parent the minor children, with the hope that the initial joint custody order would become final. However, as the trial court correctly found, defendant engaged in an ongoing series of actions which prohibited the trial court from making an award of joint legal or physical custody. From this record, we glean no error in any of the trial court's pronouncements of fact or law and accordingly, this Court finds that the trial court did not abuse its discretion in awarding plaintiff sole physical and legal custody.

Affirmed. Plaintiff, having prevailed, is entitled to costs. MCR 7.219.


/s/ David H. Sawyer
/s/ Pat M. Donofrio
/s/ Stephen L. Borrello