WRIGHT v WRIGHT

Docket No. 281918. Submitted April 8, 2008, at Detroit. Decided April 22, 2008. Approved for publication June 3, 2008, at 9:10 a.m.

Charles Wright brought an action for divorce from Monica M. Wright in the Washtenaw Circuit Court. The court, Nancy C. Francis, J., divided the marital property contrary to the terms of a postnuptial agreement regarding property, awarded the defendant legal and physical custody of the parties' minor children, and ordered the plaintiff to pay child support, alimony, and some of the defendant's attorney fees. The plaintiff appealed.

The Court of Appeals *held*:

1. The trial court did not clearly err by finding that the postnuptial agreement contemplated and encouraged the separation and divorce of a married couple and therefore was void as against public policy.

2. No merit lies in the plaintiff's argument that the trial court's child-custody consideration and final order are void because the trial court did not advise him of the meaning of "joint custody." The plaintiff cannot claim ignorance with respect to the availability of joint custody in light of the fact that he was granted joint custody in ex parte and temporary orders.

3. The trial court did not find against the great weight of the evidence regarding several of the statutory best-interest factors, MCL 722.23, and did not abuse its discretion when it awarded full custody to the defendant and limited visitation rights to the plaintiff.

4. When determining child support, the trial court did not clearly err with respect to its finding regarding plaintiff's annual salary, nor did it misapply the Michigan Child Support Formula, as the plaintiff contended, given the absence of a demonstration by the plaintiff of a deviation from the formula.

5. The trial court did not abuse its discretion by awarding to the defendant a portion of her general attorney fees and all the attorney fees she incurred to defend against the postnuptial agreement. The trial court justifiably determined that the assertion of the postnuptial agreement in the face of contrary legal

precedent amounted to unreasonable conduct and that the property division envisioned by the agreement was plainly unjust and inequitable.

6. The trial court did not abuse its discretion by awarding alimony to the defendant, considering the parties' financial circumstances.

Affirmed.

DIVORCE — CONTRACTS.

A contract that anticipates and encourages a future separation or divorce is against public policy in Michigan and is not enforceable.

*Benjamin Whitfield, Jr. & Associates, PC* (by *Benjamin Whitfield, Jr.,* and *Cynthia J. Gaither*), for the plaintiff.

*Reed Law Group, P.C.* (by *Steven A. Reed*), for the defendant.

Before: O'CONNELL, P.J., and BORRELLO and GLEICHER, JJ.

PER CURIAM. Plaintiff appeals as of right the trial court's order dividing the parties' marital property contrary to a postnuptial contract, granting defendant legal and physical custody of the parties' three minor children, and ordering plaintiff to pay child support, alimony, and defendant's attorney fees. We affirm.

Plaintiff first met defendant when she was working as a cashier at a fast-food restaurant. She was a 17-year-old high-school student and single mother of a male toddler, Anthony, and an infant daughter, Janae (born June 5, 1994), from a different relationship. Plaintiff was a corrections officer with a house, a solid career, and no children. He was 10 years older than defendant and had recently divorced his second wife. The couple started seeing each other, and when defendant turned 18 years old, she moved in with plaintiff.

She did not graduate from high school and had never lived outside her parent's home. The couple and defendant's children spent the next year living together at plaintiff's house on Rosewood in Inkster, and defendant gave birth to plaintiff's son, Charles Tyler, on March 1, 1996. About five months later, the couple was married in an informal ceremony in Toledo. Defendant went back to school and obtained her GED (general equivalency diploma), but it was clear that plaintiff was the family's breadwinner. He brought substantial assets into the marriage, including savings, investment properties, and the Rosewood house. Defendant did not bring any assets into the marriage. Plaintiff worked a substantial amount of overtime, and defendant managed the household.

In 1998, the couple sold the Rosewood house and plaintiff put a substantial amount of the proceeds into buying the family a new house on Thornhill in Ypsilanti Township, which was deeded to the parties in both their names. Around this time, plaintiff adopted Janae as his daughter. Although Anthony also lived with them, plaintiff had a much more contentious relationship with the boy, who was older and retained ties with his biological father and the paternal side of his family. In 2001, plaintiff and defendant decided that it would be a good idea for defendant to run a day-care operation at the Thornhill house. Plaintiff undertook an expensive renovation of the home to make it functional, and defendant received her license in 2002.

Also in 2002, Anthony confessed to his mother that he had touched Janae inappropriately. Needless to say, the ensuing ordeal strained Anthony's relationship with plaintiff even more, and defendant initially thought it might be best for all involved if she simply reported the incident to the authorities so Anthony and Janae could get some professional help. The couple

decided, instead, that they would monitor the children closely and deal with the problem without involving the authorities. On October 4, 2003, defendant gave birth to the parties' youngest daughter, Emma. In 2004, plaintiff went back to college to obtain his MBA (master's degree in business administration). At some point during the marriage, he also started a side business as a private investigator. Defendant, too, went back to school, and entered a nursing program at a local community college. However, tensions again mounted between Anthony and plaintiff, and by mid-2004, plaintiff gave defendant the option of sending Anthony to live with his biological father or reporting his improper conduct toward Janae to the authorities. Anthony moved out on July 2, 2004.

About one year later, the marriage was under strain. Although the parties were not separated, plaintiff had his attorney draw up a postnuptial agreement that protected all his rights to his premarital property, his retirement accounts, the marital home, and every other article of marital property requiring a substantial financial investment from him. In the attachments listing the specified properties that the parties claimed and would retain as their own separate property, plaintiff listed his retirement accounts, his vacant lots, and any property "purchased after the marriage for which I paid more than 90% of the purchase price." The agreement provided that it would supplant any property settlement or distribution that would ordinarily follow from one of the parties obtaining a divorce or dying, and it specifically provided that the parties knew that their respective financial positions would be worse because of the agreement but that their love for one another surpassed material concerns. Defendant signed the agreement on July 29, 2005. About eight months later, plaintiff filed for divorce. He did not first separate from

defendant or leave the marital home, and he did not even tell defendant that he had filed for divorce; instead, defendant was informed by an unfamiliar attorney who discovered the divorce in the court records and blindly offered to represent her.

Plaintiff remained in the Thornhill house and obtained a temporary order to maintain the status quo of joint custody for the children, just as his attorney had requested. He began taking candid photographs of defendant and her day-care business, and, unbeknownst to defendant, he also began secretly recording defendant's actions and the day care's activities. On the basis of what he recorded, he filed several complaints with Children's Protective Services and defendant's licensing bureau. Plaintiff also started becoming intensely involved in therapy for Charles Tyler and Janae. The children's therapist testified that the children would often tell her "bad" things about their mother that their father had told them to tell her. Plaintiff would later ask the therapist if she would report the matters to Children's Protective Services. The therapist never felt obliged to report any of the incidents. Plaintiff also called the sheriff's department to report statements Janae had made about a physical altercation between Janae and her mother. Interestingly, this report arose on the same day that the trial court ordered plaintiff to move out of the Thornhill home. Two days before trial, plaintiff took Charles Tyler and Janae to two different hospitals, raising allegations that the children had told them that defendant had been neglecting them. Again, he asked hospital staff to file a report with Children's Protective Services on the matter. Plaintiff failed to demonstrate at trial that any of these reported incidents, when removed from the glare of his blatant exaggeration, were nearly as severe as he originally made them out to be.

Against this backdrop, the trial court heard evidence that an anonymous tipster telephoned Children's Protective Services in late May 2006 and informed caseworkers that Anthony had inappropriately touched Janae. The report came four years after the alleged contact had occurred, two years after Anthony had been totally removed from Janae's household, and about two months after plaintiff had filed for divorce. Nothing in the record indicated that Anthony had gotten into any further trouble since he left plaintiff's household. The trial court reasonably inferred, without a hint of clear error, that plaintiff was responsible for informing the authorities, contrary to his previous arrangement with defendant. Of course, the matter was investigated, and Anthony was prosecuted, but the incident destroyed plaintiff's credibility as a caring father who was solely looking out for his children's best interests. He never reestablished the tremendous loss to his credibility. The trial court found, on the basis of strong supporting evidence, that plaintiff did not zealously pursue custody, closely monitor defendant, and scrupulously report defendant's most minor transgressions because of any paternal assiduousness, but because he wanted to hurt and defeat defendant. Certainly, his instigation of confrontation in the marital home, his alteration of the children's school arrangements for the sake of investigatory interviews, and his injection of rancorous griping against defendant in the children's therapy sessions all support the inference that plaintiff was willing to sacrifice the children's stability and well-being so that he might obtain a tactical advantage in the divorce litigation.

Ultimately, the trial court's poor opinion of plaintiff's veracity adversely affected its assessment of him under the best-interest factors, and the trial court granted defendant sole legal and primary physical custody of the

children. Having set aside the postnuptial agreement as void, the trial court divided the marital property fairly evenly and ordered plaintiff to pay defendant child support, spousal support, and her attorney fees.

Plaintiff first argues that the trial court erred by declaring the postnuptial agreement void. We disagree. This Court reviews de novo a trial court's interpretation of a contract and its resolution of any legal questions that affect a contract's validity, but any factual questions regarding the validity of the contract's formation are reviewed for clear error. *46th Circuit Trial Court v Crawford Co*, 476 Mich 131, 157; 719 NW2d 553 (2006). Although plaintiff goes to great lengths to demonstrate how the parties consented to the agreement, under Michigan law, a couple that is maintaining a marital relationship may not enter into an enforceable contract that anticipates and encourages a future separation or divorce. *Day v Chamberlain*, 223 Mich 278; 193 NW 824 (1923). As our Supreme Court stated in *Randall v Randall*, 37 Mich 563, 571 (1877): "It is not the policy of the law to encourage such separations, or to favor them by supporting such arrangements as are calculated to bring them about. It has accordingly been decided that articles calculated to favor a separation which has not yet taken place will not be supported . . . ." In the case at bar, the trial court correctly determined that the postnuptial agreement at issue was calculated to leave plaintiff in a much more favorable position to abandon the marriage. The contract plainly had, as one of its primary goals, defendant's total divestment of all marital property in the event of a divorce. The couple was not separated at the time and had never separated during the marriage, but plaintiff filed for divorce roughly eight months after defendant signed the agreement.

Plaintiff relies extensively on this Court's recent opinion in *Lentz v Lentz*, 271 Mich App 465; 721 NW2d 861 (2006), but he fails to acknowledge that *Lentz* is fundamentally distinguishable from the case at bar. *Lentz* dealt with a couple that had separated and wanted to divide marital assets in anticipation of their imminent divorce. *Id.* at 467, 473. The Court in *Lentz* specifically distinguished cases that involved postnuptial agreements that were not entered into by separated parties, and it specifically recognized that those cases met with much stricter legal scrutiny than postnuptial, postseparation agreements that essentially settled property issues arising in ongoing or imminent divorce litigation. *Id.* at 473-474 & n 5. The higher scrutiny was applied to cases that involved the property rights in a spouse's inheritance, and courts in those cases generally conditioned the enforceability of the provisions on a finding that each party, and the contract itself, expressed a desire to maintain the marital covenant. *Id.*; see *Rockwell v Estate of Rockwell*, 24 Mich App 593, 597-598; 180 NW2d 498 (1970). Therefore, the trial court did not clearly err by finding that the agreement contemplated and encouraged the separation and divorce of a married couple, and it correctly ruled that the agreement was void as against public policy. *Day, supra.*

Plaintiff next argues that the trial court erred by awarding defendant sole custody without first explaining to him, on the record, what it meant to have joint custody. We disagree. We review de novo questions of law and issues of statutory interpretation. *Lash v Traverse City*, 479 Mich 180, 186; 735 NW2d 628 (2007).

Plaintiff essentially argues that the trial court's child-custody consideration and final order are void on a legal technicality. He argues, without citing any authority directly supporting the proposition, that the

trial court's custody determination was automatically void because the court did not advise him of the meaning of "joint custody," as required by MCL 722.26a. That statute states, in part, "In custody disputes between parents, the parents shall be advised of joint custody." MCL 722.26a(1). In this case, however, plaintiff was more than "advised" of joint custody; he was actually granted joint custody in both the invalidated ex parte order he filed and in the replacement temporary order to maintain the custodial status quo. Plaintiff filed the initial ex parte order maintaining joint custody, and it was entered the day after he filed his complaint for divorce. During court proceedings, the trial court directly referred to the parties scheduling an equal split of parenting time so that the couple could maintain their equal division of the children's care and custody. Therefore, plaintiff's claims of ignorance regarding the concept or availability of joint custody are totally belied by the record, and his spurious arguments regarding the validity of the trial court's final custody determination have no factual or legal support.

Plaintiff next argues that the trial court's findings regarding several of the best-interest factors were contrary to the great weight of the evidence. MCL 722.28; *MacIntyre v MacIntyre (On Remand)*, 267 Mich App 449, 451; 705 NW2d 144 (2005). We disagree. Because this case was heard as a bench trial, the court was obligated to determine the weight and credibility of the evidence presented. *Gorelick v Dep't of State Hwys*, 127 Mich App 324, 333; 339 NW2d 635 (1983). Also, the record reflects a deep-seated animosity between the parties and an irreconcilable divergence in their opinions about how to foster each child's well-being. This antagonism even affected their ability to make civil parenting exchanges. Therefore, joint custody was not an option, because the record reflected that the parties

would not "be able to cooperate and generally agree concerning important decisions affecting the welfare of the child." MCL 722.26a(1)(b).

The best interests factors are found at MCL 722.23, and plaintiff challenges the trial court's findings regarding factors b, c, f, g, h, i, and j:

Factor b: "The capacity and disposition of the parties involved to give the child love, affection, and guidance and to continue the education and raising of the child in his or her religion or creed, if any." MCL 722.23(b). At the time of trial, plaintiff had filed three reports with day-care licensing authorities against defendant and at least two complaints with Children's Protective Services, all of which were "verified" by footage clandestinely captured on DVD by plaintiff while he was still in the home. Plaintiff admitted running a video camera and taping "dangerous" situations in the day care without providing any assistance to the "endangered" children. The record reflects that plaintiff took extensive footage of defendant's activities without her knowledge, and that he openly took an irritating number of still photos of her, too. Throughout the divorce, plaintiff filed three police reports, two attorney grievances, and a motion to disqualify the trial judge. On the basis that Children's Protective Services and law-enforcement officials wanted to interview the children, plaintiff picked up Janae and Tyler from school without telling defendant. One of the children's therapists testified that plaintiff used therapy sessions as "a vehicle for the children to report all the bad things their mother did. Daddy said to tell us. Daddy said to tell you this."

The trial court determined, with adequate justification, that plaintiff was willing to act as though he was interested in the children just to "win" custody from their mother. In contrast, defendant did not appear

intent on exaggerating any wrongdoing, and she credibly answered questions regarding both parties' interest in the children and their love for them, mentioning only that plaintiff's interests in monitoring their lives had intensified significantly with the litigation. She was the primary caregiver for years and was able to answer specific questions about Charles Tyler's needs, Janae's interests, and even young Emma's personality. In light of the trial court's valid findings of manipulation by plaintiff, the trial court did not decide contrary to the great weight of the evidence when it found that this factor, and all the others that hinged on a sincere concern for the children's general well-being, favored defendant.

Factor c: "The capacity and disposition of the parties involved to provide the child with food, clothing, medical care or other remedial care recognized and permitted under the laws of this state in place of medical care, and other material needs." MCL 722.23(c). The trial court correctly found that the parties' financial status, once adjusted, would not create a significant advantage to either party. It also correctly determined that plaintiff's health-care coverage provided him with a superficially better position on this factor. However, the trial court was concerned about how plaintiff had attempted to "misuse health care providers" to interfere with defendant's custody and parenting time, so it found that this factor favored defendant, too. Given plaintiff's misuse of the hospitals before trial and his undue influence over therapists, the trial court's determination of this factor does not run contrary to the great weight of the evidence.

Factor f: "The moral fitness of the parties involved." MCL 722.23(f). Plaintiff adamantly argues that the trial court had no evidence linking him to Anthony's prosecution, which was the primary factor weighing against

him on this issue. However, the inference was a reasonable one in light of plaintiff's other conduct in the case, which made him appear manipulative and generally vindictive. In fact, the only issues plaintiff raises in support of his claim on this factor are greatly exaggerated, and somewhat repugnant, accusations he made against defendant at trial. Interestingly, plaintiff does not spend much effort building his side of the case with evidence of his moral merit. The trial court's determination on this issue was not against the great weight of the evidence.

Factor g: "The mental and physical health of the parties involved." MCL 722.23(g). The trial court found that this factor did not favor either party. Contrary to plaintiff's unverified claims, a psychologist testified that defendant did not have any suicidal tendencies or harbor suicidal thoughts. The psychologist confirmed that defendant had a mild and treatable form of depression called dysthymia. Plaintiff's second argument exaggerates an incident in which defendant shook a fork in Janae's face and told her to stop her inappropriate behavior. In the end, plaintiff tried to influence a therapist into reporting the behavior as abuse, but the therapist did not see any evidence of abuse and refused to yield to plaintiff's pressure. In turn, plaintiff demonstrated unusual patterns of thought and an evasive attitude about his mental makeup. Ultimately, the trial court did not find against the great weight of the evidence when it found that the parties had no physical or mental health issues that inhibited their ability to parent.

Factor h: "The home, school, and community record of the child." MCL 722.23(h). The trial court determined that defendant had a sincere interest in each child's general well-being at home, in school, and in the

child's other activities. The trial court clearly attributed a portion of each child's success to defendant's involvement. In contrast, the trial court did not believe that plaintiff's intensified interest in his children would extend beyond winning custody from their mother. On appeal, plaintiff merely reiterates the self-serving and largely superficial testimony that the trial court rejected as insincere at trial. Therefore, the trial court did not contravene the great weight of the evidence when it determined that this factor favored defendant.

Factor i: "The reasonable preference of the child, if the court considers the child to be of sufficient age to express preference." MCL 722.23(i). The trial court interviewed all three children, and it did not reveal which party was favored. However, plaintiff argues that the trial court should not have considered Charles Tyler's preference because of his language disabilities. Without any citation of authority, see *Mitcham v Detroit*, 355 Mich 182, 203; 94 NW2d 388 (1959), plaintiff argues that the trial court abused its discretion by not first holding a competency hearing on Charles Tyler's ability to comprehend the trial court's inquiries. However, the statute leaves the discretion to conduct an in camera interview to the trial court, and plaintiff fails to provide any indication, beyond the bare argument, that Charles Tyler's disability was so severe that the trial court could not have rationally decided that the interview could achieve its intended purpose. Therefore, plaintiff fails to demonstrate any abuse of discretion in the trial court's decision that the in camera interview would prove useful. See *Duperon v Duperon*, 175 Mich App 77, 81-82; 437 NW2d 318 (1989). The trial court's capacity and willingness to exercise sound discretion is apparent from its decision that Emma was too young to provide any helpful information. Plaintiff fails to establish any error in the trial court's decision.

Factor j: "The willingness and ability of each of the parties to facilitate and encourage a close and continuing parent-child relationship between the child and the other parent or the child and the parents." MCL 722.23(j). Finally, the trial court correctly found that the evidence in this case established that plaintiff showed a winner-take-all approach to custody, and that he used the children's problems to make him look more favorable and manipulate the custody award. Ironically, plaintiff cites excerpts from his two biggest critics to support his argument that the trial court overlooked evidence that favored him. The therapist plaintiff cites repeatedly testified that plaintiff would prompt the children to bring in "tattletale information" and that defendant was not as eager to resort to those tactics. Likewise, plaintiff cites a portion of defendant's testimony in which defendant claimed that shared custody of Charles Tyler was still possible if plaintiff would correct his behavior. However, plaintiff fails to cite any corresponding testimony that he ever believed that he could collaborate with defendant enough to make shared custody a viable option, so the cited testimony actually reinforces the trial court's determination that plaintiff was the individual responsible for the impossibility of maintaining joint custody. The trial court's findings on this factor did not expressly favor one side over the other, but the trial court unmistakably decided in accordance with the great weight of the evidence when it found that the parties did not have the capacity to facilitate the other parent's relationship with the children. Under the circumstances, the trial court did not find against the great weight of the evidence regarding any of the best-interest factors, and it did not abuse its discretion when it awarded full custody to defendant, with plaintiff receiving fairly limited visitation rights. *MacIntyre, supra.*

Plaintiff next argues that the trial court erred in its determination of the child-support award. We disagree. We review for clear error a trial court's factual findings underlying a particular child-support award. *Stallworth v Stallworth*, 275 Mich App 282, 284; 738 NW2d 264 (2007). Plaintiff fails to establish any error in the trial court's determination of his income or in its final determination of the child-custody award. Plaintiff only raises two generic challenges without pointing to any legitimate error in the trial court. First, plaintiff argues that the trial court should have taken an average of his gross incomes from 2005 (which he claims on appeal was $52,764) and 2006 (which he claimed was $53,513.67), leaving a claimed average of $53,138.84. However, plaintiff does not offer any evidence regarding his gross income from 2005 except his trial testimony that it was "around 60." His calculation of his "gross" income from 2006 fails to account for a rather large $10,819.94 exclusion from his taxable income in Box 12 of his State of Michigan W-2. The Medicare and Social Security portions of his W-2 suggest that his "gross" income was actually $64,333.81 for 2006. Given that the trial court's estimate took into consideration plaintiff's habit of taking overtime, plaintiff has not demonstrated clear error in the trial court's use of a $64,901 annual salary as the basis for calculating his child-support obligation.

Second, plaintiff also argues that the trial court misapplied the Michigan Child Support Formula, but he does not specify where the trial court's application went astray, and he does not present an alternative application of the formula. Plaintiff may not merely "announce a position or assert an error and then leave it up to this Court to discover and rationalize the basis for his claims, or unravel and elaborate for him his arguments, and then search for authority either to sustain or reject

his position." *Mitcham, supra* at 203. Without demonstrating that the trial court deviated from the guidelines, plaintiff fails to demonstrate that the trial court neglected to explain its deviation in accordance with MCL 552.605(2). See *Burba v Burba (After Remand)*, 461 Mich 637, 645-646; 610 NW2d 873 (2000).

Next, plaintiff argues that the trial court should not have awarded defendant any attorney fees. We disagree. "This Court reviews a trial court's grant of attorney fees for an abuse of discretion." *Stallworth, supra* at 288. The trial court did not abuse its discretion by awarding defendant a portion (30 percent) of her general attorney fees and all the attorney fees she incurred to defend against the postnuptial agreement. "Necessary and reasonable attorney fees may be awarded to enable a party to carry on or defend a divorce action." *Id.* Clearly, the trial court deemed that the assertion of the postnuptial agreement in the face of contrary legal precedent amounted to unreasonable conduct. The property distribution envisioned by the agreement was plainly unjust and inequitable, so this finding was adequately supported by the record and justified the trial court's award of all the attorney fees related to the void agreement. See *Stackhouse v Stackhouse*, 193 Mich App 437, 445; 484 NW2d 723 (1992). Moreover, defendant testified that she had incurred more than $22,500 in attorney fees, and she made only $30,000 a year. Plaintiff made twice as much each year, but the trial court exercised its discretion and awarded defendant only 30 percent of her general attorney fees. Under the circumstances, plaintiff fails to demonstrate that the trial court abused its discretion by awarding defendant a limited amount of her attorney fees. See *Stallworth, supra* at 288-289.

Finally, plaintiff argues that the trial court erred by granting defendant alimony. We disagree. This Court

reviews a trial court's award of alimony for abuse of discretion. *Pelton v Pelton*, 167 Mich App 22, 27; 421 NW2d 560 (1988). "The main objective of alimony is to balance the incomes and needs of the parties in a way that will not impoverish either party. Alimony is to be based on what is just and reasonable under the circumstances of the case." *Moore v Moore*, 242 Mich App 652, 654; 619 NW2d 723 (2000) (citations omitted). An appellate court should affirm a dispositional ruling, like an award of alimony, "unless the appellate court is left with a firm conviction that the decision was inequitable." *Korth v Korth*, 256 Mich App 286, 288; 662 NW2d 111 (2003).

A brief comparison of the parties' financial circumstances adequately demonstrates ample justification for the relatively modest award of $200 a month in alimony. Plaintiff has a master's degree in Business Administration, which he obtained after the marriage, and defendant has a GED. Plaintiff earns more than $64,000 a year, excluding income from his investigation business and two vacant properties, and defendant earns an estimated $30,000 a year from the day care. During the marriage, defendant was a stay-at-home mom, and plaintiff worked a lot of overtime. Defendant moved into plaintiff's home at the age of 18. Plaintiff was 10 years older and already had established himself in a career. Plaintiff fails to demonstrate that the trial court neglected to consider any of the factors presented in *Thames v Thames*, 191 Mich App 299, 308; 477 NW2d 496 (1991). Instead, plaintiff complains about the amount of debt defendant accumulated and the fact that she was awarded an inordinate portion (half) of the interest in the marital home. However, the trial court assigned defendant all of her $43,000 worth of debt and ruled that any sale of the marital home, including a buyout by plaintiff, would warrant revisiting the award

of spousal support. Under the circumstances, plaintiff fails to demonstrate anything inequitable in the trial court's award of spousal support, and the trial court did not abuse its discretion by awarding defendant $200 a month in spousal support until she remarried, sold the marital home, or died. *Korth, supra.*

Affirmed.