*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

THOMAS S. RUDZINSKI,

      Plaintiff-Appellee,

v

DOLORES ANNETTE RUDZINSKI,

      Defendant-Appellant.

UNPUBLISHED
March 10, 2022

No. 355312
Antrim Circuit Court
LC No. 2019-008195-DO

Before: REDFORD, P.J., and SAWYER and MURRAY, JJ.

PER CURIAM.

In this divorce action, defendant, Dolores Rudzinski, appeals by leave granted[1] the trial court's interlocutory order denying Dolores's motion to enforce a marriage settlement agreement between Dolores and plaintiff, Thomas Rudzinski. We reverse and remand with instructions to enforce the settlement agreement.

## I. FACTS

The parties married in 1982, and they have two children, who are both adults. Dolores also has two other adult children from another relationship. Thomas is a dentist with his own dental practice, called Elk Rapids Family Dentistry, and Dolores works for the dental practice as the office manager and bookkeeper.

During their marriage, the parties accumulated several major assets: (1) the dental practice; (2) the building in which the dental practice is located (140 River Street); (3) the marital home; and (4) retirement accounts. The parties also own vehicles, as well as miscellaneous personal property and household goods. And the parties have various debts, including a line of credit on the marital home and a mortgage on the dental-practice building.

---

[1] *Rudzinski v Rudzinski*, unpublished order of the Court of Appeals, entered March 18, 2021 (Docket No. 355312).

In 1992, the parties created the "Rud Family Preservation Trust" to protect some of their assets from possible exposure in the event that there was a malpractice claim against Thomas. Under the trust, Thomas is identified as the trustor, while Dolores and her sister were trustees. The trust is described as an irrevocable trust with a duration of 50 years unless terminated earlier by unanimous decision of the trustees. Property—namely, the marital home and the dental-practice building—were transferred into the trust by Thomas.[2] In exchange, the trust issued Thomas a total of 200 units of "Beneficial Interests." However, once the units were issued, Thomas and the trustees then redistributed the units among four designated beneficiaries as follows: (1) 192 units to Dolores and (2) two units for each of the four children. In short, Dolores has a 96% beneficial interest in the trust, and Thomas has no interest in the trust.

Thomas runs his dental practice from the building held in the trust, and the dental practice pays rent to the trust for the use of the dental-practice building. The rent paid by the practice covers costs for the dental building, including things like taxes, mortgage, utilities, and phone bills. The trust also uses its income, i.e., the rent, to pay the mortgage and utilities for the marital home. According to Dolores, after the various bills are paid, there is no real profit for the trust. She noted that, after recently paying taxes, the trust's bank account balance was $163.

In 2011, the parties separated. Both parties continued to reside in the marital home and to do some activities—such as family dinners—together. However, they were "not acting as husband and wife," and they were essentially "roommates" with separate rooms. In October 2015, the parties began discussions about formally ending the marriage. Over the next several months, the parties had several meetings about dissolving their marriage and dividing their assets. These conversations culminated in a marriage settlement agreement, drafted by Dolores, which the parties both signed in June 2016. In terms of its provisions, the settlement agreement addresses several topics: (1) the marital home; (2) Thomas's retirement accounts; (3) the dental practice, including Dolores's continued employment at the practice; (4) the building in which the dental practice is located; (5) spousal support for Dolores; (6) personal property; and (7) debts.

In January 2019, Thomas filed for divorce. Dolores then moved to enforce the marital settlement agreement between the parties. Thomas opposed the motion, asserting that (1) it was currently financially impossible for him to comply with the portion of the agreement requiring him to pay spousal support to Dolores, particularly in light of his age, and (2) that the agreement was illusory because one of its terms provided for the split of equity following the sale of the dental-practice building, but Dolores could not guarantee that Thomas would receive any proceeds from the sale of the building where the dental practice was located.

Following an evidentiary hearing at which both parties testified, the trial court denied Dolores's motion to enforce the settlement agreement. Briefly summarized, the trial court appeared to conclude that the agreement should not be enforced because (1) the term about selling the dental-practice building was illusory, (2) the agreement contained ambiguous terms, (3) the

---

[2] More specifically, because property was titled in the names of both Dolores and Thomas, Dolores first conveyed her interest in the dental-practice building to Thomas, and Thomas then transferred the building to the trust.

agreement contained terms that were impossible to perform, and (4) Thomas signed the agreement under duress. Dolores filed an interlocutory application for leave to appeal, which we granted.

## II. ANALYSIS

On appeal, Dolores contests thetrial court's rulings with regard to (1) whether the agreement was illusory, (2) whether the agreement was ambiguous, (3) whether the agreement contained terms that were impossible to perform, and (4) whether Thomas signed the agreement under duress. Additionally, Dolores contends that the trial court impermissibly considered equity when deciding her motion. Finally, the trial court also made two factual findings that Dolores challenges on appeal—namely, (1) that Dolores drafted the trust documents and (2) that Thomas did not know the dental building had been placed in the trust. Although not all Dolores's arguments have merit, we agree with Dolores that the trial court erred by failing to enforce the settlement agreement.

## A. STANDARD OF REVIEW

When considering the enforceability of a settlement agreement, "[t]he finding of the trial court concerning the validity of the parties' consent to a settlement agreement will not be overturned absent a finding of an abuse of discretion. A trial court's factual findings are reviewed for clear error." *Vittiglio v Vittiglio*, 297 Mich App 391, 400; 824 NW2d 591 (2012) (quotation marks and citations omitted). To the extent this case requires contract interpretation, "[t]his Court reviews de novo a trial court's interpretation of a contract and its resolution of any legal questions that affect a contract's validity, but any factual questions regarding the validity of the contract's formation are reviewed for clear error." *Wright v Wright*, 279 Mich App 291, 297; 761 NW2d 443 (2008).

## B. LEGAL FRAMEWORK

"Generally, contracts between consenting adults are enforced according to the terms to which the parties themselves agreed." *Lentz v Lentz*, 271 Mich App 465, 471; 721 NW2d 861 (2006). These general principles of contract interpretation and enforcement apply to contracts between spouses negotiating their "own property disposition in anticipation of separation or divorce." *Id*. at 471-472. Indeed, "[p]ublic policy favors upholding a property agreement negotiated by the parties when divorce or separate maintenance is clearly imminent." *Id*. at 477-478.

> It is a well-settled principle of law that courts are bound by property settlements reached through negotiations and agreement by parties to a divorce action, in the absence of fraud, duress, mutual mistake, or severe stress which prevented a party from understanding in a reasonable manner the nature and effect of the act in which she was engaged. This rule applies whether the settlement is in writing and signed by the parties or their representatives or the settlement is orally placed on the record and consented to by the parties, even though not yet formally entered as part of the divorce judgment by the lower court. [*Id*. at 474-475 (quotation marks and citations omitted).]

"Such agreements undoubtedly promote judicial efficiency and best effectuate the intent and needs of the parties." *Id*. at 478. Courts "will not rewrite or abrogate an unambiguous agreement negotiated and signed by consenting adults by imposing a 'reasonable' or 'equitable' inquiry on the enforceability of such agreements." *Id*. at 478. Instead, general contract principles apply. *Id*. at 474 n 5, 478. If a settlement agreement is ambiguous a court may, however, interpret and clarify its terms, provided that the court does not change the parties' substantive rights as reflected in their agreement. *Neville v Neville*, 295 Mich App 460, 469; 812 NW2d 816 (2012); *Bers v Bers*, 161 Mich App 457, 464; 411 NW2d 732 (1987).

"The party seeking to enforce a contract bears the burden of proving that the contract exists." *AFT Mich v Michigan*, 497 Mich 197, 235; 866 NW2d 782 (2015). "The essential elements of a valid contract are the following: (1) parties competent to contract, (2) a proper subject matter, (3) a legal consideration, (4) mutuality of agreement, and (5) mutuality of obligation." *Hess v Cannon Twp*, 265 Mich App 582, 592; 696 NW2d 742 (2005). However, a party seeking to avoid a contract on the basis of a contract defense—such as duress or fraud—bears the burden of proving that defense. *Morris v Metriyakool*, 418 Mich 423, 439-440; 344 NW2d 736 (1984).

## C. CONSIDERATION OF EQUITY

Under *Lentz*, 271 Mich App at 474-475, 478, the trial court was bound to enforce the settlement agreement in the absence of fraud, duress, mutual mistake, or severe stress. Moreover, the trial court could not rewrite or abrogate the agreement on the basis of a "reasonable" or "equitable" inquiry into the contract's terms. *Id*. at 478. Emphasizing these principles, Dolores first contends on appeal that the trial court violated *Lentz* by considering equity. Relevant to Dolores's argument, in the course of its discussion of *Lentz*, the trial court mentioned a footnote in *Lentz*,[3] commenting that it was "interesting" that the *Lentz* Court disavowed equitable considerations but then in a footnote stated that the wife, who was contesting the enforceability of the agreement, received roughly $2 million. According to Dolores, this remark evinces the trial court's improper consideration of equitable principles. This argument lacks merit.

When considered in context, the trial court's commentary on the *Lentz* footnote was nothing more than an aside. The trial court articulated the correct standard from *Lentz* at length. And, in commenting on the *Lentz* footnote—and what the trial court viewed as an improper consideration of equity in that footnote—the trial court expressly stated that it was "just add[ing] that as an interesting comment and wondering what they were thinking, like putting that in a footnote." The trial court did not suggest that this footnote gave the court leave to consider equitable concerns in this case, and the trial court's reasoning does not support that its decision was based on the equity of the property settlement in the agreement. The trial court is presumed to know and follow the law, unless the contrary is shown, see *Demski v Petlick*, 309 Mich App 404, 427; 873 NW2d 596 (2015), and when considered in context, there is nothing in the trial

---

[3] See *Lentz*, 271 Mich App at 478 n 7.

court's comments on the *Lentz* footnote to support that the trial court misunderstood or failed to apply the correct legal standards from *Lentz*.[4]

## D. FACTUAL ERRORS

Dolores also challenges two factual findings by the trial court. First, in the course of its findings, the trial court stated that Dolores "drafted the trust agreement apparently . . . ." This conclusion is clearly erroneous. Both Dolores and Thomas testified that they hired an attorney named Don Nielson to draft the trust documents. There was no evidence whatsoever that Dolores drafted the trust documents.

Second, the trial court also stated in its findings that "[t]he building was transferred to the trust and [Thomas] didn't know it." Again, this conclusion had no basis in the record. Thomas was fully aware that the building was held by the trust. He signed the trust documents and the deed transferring the building to the trust, and he did so because he was trying to protect assets from possible malpractice issues that could arise related to his dental practice. That he clearly knew the building was in the trust is also supported by his contention that Dolores threatened to sell everything and leave him without a building for his practice if he did not sign the settlement agreement. The conclusion that Thomas was somehow unaware that the building was transferred to the trust is clearly erroneous.

Although the trial court's factual findings in this regard were clearly erroneous, neither finding appears particularly relevant to the trial court's substantive conclusions related to duress,

---

[4] On appeal, Thomas contends that *Lentz* does not apply to this case and that the contract is void as against public policy, or at least reviewable for reasonableness, because it is a preseparation agreement, rather than an agreement reached in anticipation of divorce as in *Lentz*. See *Skaates v Kayser*, 333 Mich App 61, 76; 959 NW2d 33 (2020); *Wright*, 279 Mich App at 297; *Lentz*, 271 Mich App at 474 n 5. This issue is waived because Thomas failed to raise it in the trial court. See *Walters v Nadell*, 481 Mich 377, 387; 751 NW2d 431 (2008). In any event, Thomas's argument lacks merit. His reliance on *Wright* and other cases involving agreements reached between couples "maintaining a marital relationship" is clearly misplaced on the facts of this case in which the parties undisputedly separated in 2011. It is true that they lived in the same house when they negotiated their agreement. But they were not living as "husband and wife." They were described as "roommates." On these facts, it cannot be said that they were a couple "maintaining a marital relationship" when they reached their agreement. See *Wright*, 279 Mich App at 297-298; see also *Day v Chamberlain*, 223 Mich 278, 281; 193 NW 824 (1923) (concluding postnuptial agreement to effectuate future separation was void as against public policy when the couple was "living *and cohabiting* together" at the time of the agreement) (emphasis added). Indeed, the trial court found as a factual matter—consistent with the evidence presented—that the parties separated in 2011. Further, they negotiated, and signed the agreement in 2016, in anticipation of divorce. In short, this not a preseparation agreement between a couple maintaining a marital relationship. See *Wright*, 279 Mich App at 297-298. It is a postseparation agreement entered into by the parties in anticipation of divorce, and it not subject to review for reasonableness or equity. See *Lentz*, 271 Mich App at 474 n 5. Thomas's arguments to the contrary lack merit.

ambiguity, impossibility, or illusory promises. In other words, it does not appear that these errors, on their own, affected the outcome of the case, and reversal is, therefore, not warranted on the basis of these errors. See MCR 2.613(A); *Ellison v Dep't of State*, 320 Mich App 169, 179; 906 NW2d 221 (2017).

## E. ILLUSORY PROMISES

"An 'illusory contract' is defined as an agreement in which one party gives as consideration a promise that is so insubstantial as to impose no obligation. The insubstantial promise renders the agreement unenforceable." *Employers Mut Cas Co v Helicon Assoc, Inc*, 313 Mich App 401, 407; 880 NW2d 839 (2015) (quotation marks, citation, and brackets omitted), rev'd on other grounds 500 Mich 986 (2017). This Court has also explained an illusory promise as follows:

> There are certain forms of expression that have been described as illusory promises. As this term itself implies, an illusory promise is not a promise at all as that term has been herein defined. If the expression appears to have the form of a promise, this appearance is an illusion. Suppose, for example, that X guarantees payment of P's note in return for C's written promise to forbear from suing P as long as C wishes to forbear. In this case C's words may create the illusion of a promise, but, in fact, he has made no promise. The fundamental element of promise seems to be an expression of intention by the promisor that his future conduct shall be in accordance with his present expression, irrespective of what his will may be when the time for performance arrives. In the supposed case, the words used by C are not such as may reasonably be relied upon by P. The clear meaning of C's expression is that his future conduct is to be in accordance with his own future will, just as it would have been, had he said nothing at all. [*Mastaw v Naiukow*, 105 Mich App 25, 29; 306 NW2d 378 (1981) (quotation marks and citation omitted).]

*Mastaw* involved a "classic example" of an illusory promise. *Id*. In that case, the parties entered into settlement agreements to resolve claims, including false arrest, assault and battery, and malicious prosecution. *Id*. at 26-27. As written, the agreements "were explicitly stated as being contingent on the approval of the Detroit Common Council." *Id*. at 27. Given that the settlement expressly required outside approval, this Court concluded that the settlement was illusory because it did not bind the defendants to anything. *Id*. at 29. This Court reasoned:

> Since the Detroit Common Council had unfettered discretion to accept or reject the settlement, its options were in no way limited by the supposed settlement. Defendants gave plaintiff nothing of value nor experienced any detriment at the time the "settlement" was entered into as only the Detroit Common Council could make a binding compromise of claims against the city. [*Id*.]

In the present case, the trial court concluded that the settlement agreement term related to the sale of the dental-practice building was illusory. The trial court reasoned:

> One, it's illusory, the term on selling the building. The building and the dental practice on River Street was placed into a trust that was drafted by [Dolores] and

that was placed into the trust prior to the execution of the marital separation agreement. [Thomas] has no interest in that trust.

Now, if the marital separation agreement indicates that if the building is sold then they'll separate—or they'll divide 50 percent each the equity in the building, well, half of nothing is still nothing. And that's what—that's what the reality is in that circumstance in that clause is that the doctor (inaudible) from that. And that's an illusory term of that agreement.

With regard to the trial court's reasoning, the settlement agreement provided that the dental-practice building will be sold when Thomas stops practicing dentistry full-time, unless the parties both agreed "to do something different with the building." Following the sale of the building, the agreement provided that the parties would be compensated as follows:

Whenever the building at 140 River Street, is sold, the equity will be divided equally between Thomas and Dolores, after all fees, taxes, liens, or commissions are paid in full. If there are any unpaid rents from Elk Rapids Family Dentistry or if Dolores is owed any equity still from the sale of the practice, they will also be paid in full from Thomas' equity.

Considering this provision regarding the distribution of equity in the building, we conclude that the trial court's determination of illusoriness was erroneous. The trial court appeared to conclude that the promise was illusory because the parties did not personally own the building, meaning that Dolores essentially promised to give Thomas 50% of nothing and "half of nothing is still nothing." Contrary to the trial court's reasoning, Dolores did not promise to give Thomas nothing. She promised to him the value of half the equity in the building, subject to fees, taxes, liens, etc. The trial court's conclusion that Thomas had been promised "nothing" from the sale of the building is contrary to terms of the agreement. And the trial court's reasoning in this regard does not provide a basis for concluding that there was a promise so "insubstantial" as to render the agreement unenforceable. See *Employers Mut Cas Co*, 313 Mich App at 407.

Indeed, on appeal, Thomas does not endorse the trial court's "half of nothing is still nothing" rationale to support that the contract is illusory. Instead, Thomas takes a different course and argues that the contract is illusory because Dolores will need the approval of the other cotrustee before she can sell the property and distribute its proceeds. In support of this argument, Thomas relies on *Mastaw*, 105 Mich App at 29, for the proposition that Dolores's need for approval from the cotrustee renders her promise to sell the building and distribute the proceeds illusory. However, *Mastaw* is distinguishable because that case involved an explicit provision *in the settlement agreement*, conditioning the settlement on approval from the Detroit Common Council. *Id*. at 26. Nothing on the face of the settlement agreement in this case provides Dolores with the option not to perform in the future nor does it condition her performance on approval from a cotrustee. See *Black's Law Dictionary* (11th ed) (defining "illusory promise" as "[a] promise that appears *on its face* to be so insubstantial as to impose no obligation on the promisor[.]") (emphasis added). Without qualification, she agreed to split the equity with Thomas. The promises, as stated in the settlement agreement, are not illusory. See *Mastaw*, 105 Mich App at 29.

That is not to say that the trust does not complicate issues in this case. It does. In 1992, Thomas and Dolores made the decision to place the dental-practice building in a trust. They hired an attorney to draft trust papers; Dolores transferred her interest in the building to Thomas; and Thomas then transferred the building to the trust. Dolores and a second cotrustee administer the trust. Thomas has no interest in the trust, while Dolores has 192 out of 200 "beneficial units" in the trust. The other eight units are divided equally between the parties' two children and Dolores's two additional children from another relationship. All the children are now adults.

The trust was set up as an irrevocable trust, making it a legally distinct entity capable of holding title to property. See 2 Turner, Equitable Distribution of Property (4th ed), § 6:94. And, unless a third party has conspired with one spouse to deprive the other spouse of an interest in the marital estate, the trial court generally lacks authority, in a divorce action, to adjudicate the rights of third parties or to distribute property held by a third party. See *Thames v Thames*, 191 Mich App 299, 302; 477 NW2d 496 (1991). It also "goes without saying that a contract cannot bind a nonparty." *AFSCME Council 25 v Wayne Co*, 292 Mich App 68, 80; 811 NW2d 4 (2011) (quotation marks and citation omitted).

It does not follow, however, that property held by a separate legal entity is necessarily irrelevant in a divorce action or to a settlement agreement related to a divorce action. Even when separate entities are involved, the trial court "need not ignore reality" when determining the extent of a party's interest for purposes of distributing marital property. *Reed v Reed*, 265 Mich App 131, 158; 693 NW2d 825 (2005). See also *Gates v Gates*, 256 Mich App 420, 428; 664 NW2d 231 (2003) (considering "the reality of the situation surrounding ownership"). For example, while a trial court cannot convey property to a third party, it may determine whether the equity in the property is part of the marital estate for purposes of dividing property between the spouses who are party to the divorce. See, e.g., *Gates*, 256 Mich App at 428 (awarding property to husband at $0 value because none of the equity was part of the marital estate, and the spouses were essentially holding the property in trust for others). By the same token, parties reaching their own settlement agreements in a divorce action may find it necessary to address assets involving third parties.

In this case, although the dental-practice building has been placed in trust, the reality is that Dolores owns 96% of "beneficial units" in the trust and she serves as one of the trustees. Further, the building was owned by the parties as marital property until they decided to convey it to the trust in 1992 as a means of protecting the family's assets from possible malpractice claims. Clearly, given the inclusion of terms regarding the building in their agreement, the parties viewed the building as marital property, and they recognized the necessity of addressing this property in their settlement. To do so, they agreed that, whenever the building is sold, the parties would split the equity, subject to fees, commissions, and any liens. Given that the trust owns the building, practically speaking, splitting the equity will require dissolution of the trust and a distribution of its assets.[5] Upon dissolution, Dolores will receive 96% of the trust assets, and given the terms of

---

[5] Dolores, as one of two cotrustees, cannot unilaterally promise action by the trust, particularly without regard to the interests of the other trust beneficiaries, and she did not purport to make a promise on behalf of the trust. To the extent Dolores's ability to share the equity is dependent on action by the trust, it would appear that Dolores has assumed the risk that the trust will not act as

the settlement agreement, she will be obligated to pay Thomas his share of the equity from the building. Notably, in their agreement, the parties did *not* endeavor to afford Thomas an interest in the trust or to resolve the rights of third parties, other than recognizing that fees, commissions, and liens would be paid before the parties split the equity. Fairly considered, the parties simply reached a clear settlement agreement regarding their respective shares in the equity in the building following the sale of the building. That a trust is involved does not invalidate this agreement between the parties.

## F. AMBIGUITY

"A contract is ambiguous only when two provisions irreconcilably conflict with each other or when [a term] is equally susceptible to more than a single meaning." *Bodnar v St John Providence, Inc*, 327 Mich App 203, 220; 933 NW2d 363 (2019) (quotation marks and citation omitted; alteration in original). However, a contract that is merely "inartfully worded or clumsily arranged" is not ambiguous if it "fairly admits of but one interpretation." *Meagher v Wayne State Univ*, 222 Mich App 700, 722; 565 NW2d 401 (1997). "Whether a contract is ambiguous is a question of law, while determining the meaning of ambiguous contract language becomes a question of fact." *Bodnar*, 327 Mich App at 220. Extrinsic evidence may be considered to aid in construction of an ambiguous term. *Klapp v United Ins Group Agency, Inc*, 468 Mich 459, 469; 663 NW2d 447 (2003).

In this case, the trial court stated that the settlement agreement was ambiguous, and the trial court indicated that, in the future, a dispute could arise that would require the trial court's involvement because the terms were not entirely clear. More fully, the trial court stated:

> Is it ambiguous, there's several areas in the agreement that are ambiguous in my view. And you have to recall and you have to understand that what I have difficulty with, with some of these agreements when they're not legally sufficient, is that after a divorce the attorneys go on their way. Mr. Fisher [Dolores's attorney] goes on to his next case. Mr. Phelps [Thomas's attorney] goes on to his next case. And then all of a sudden I get a motion to enforce an agreement dropped on my desk and I have to deal with it at that time.

> And trying to understand what the parties wanted to do and whether or not there was any duress or coercion on someone who signed it makes it very difficult for the court. As I had indicated half of zero is still zero. The building was transferred to the trust and he didn't know it.

---

she anticipates. See Restatement Contracts, 2d, § 261, comment *e* ("Even if a party contracts to render a performance that depends on some act by a third party, he is not ordinarily discharged because of a failure by that party because this is also a risk that is commonly understood to be on the obligor."). However, what remedy will be available to Thomas in the event that the trust does not dissolve is not the question at this time. The question is whether Dolores's promise was illusory. And as written, she promised—without qualification—to share the equity in the dental building with Thomas. The promise is not illusory.

The trial court's reasoning is flawed. The trial court stated that there were "several areas" of the agreement that were ambiguous, but it failed to actually identify an ambiguous provision. Further, the parties have not argued that there are ambiguous terms. And, in any event, assuming some ambiguity, the trial court should have endeavored to ascertain the parties' intent, considering extrinsic evidence if necessary. See *Klapp*, 468 Mich at 469. See also *Neville*, 295 Mich App at 469; *Bers*, 161 Mich App at 464. The trial court erred by failing to enforce the agreement on the basis of some unspecified ambiguity or the possibility that a dispute may arise in the future related to the execution of the agreement.

## G. IMPOSSIBILITY

This Court has explained the defense of impossibility as follows:

> A promisor's liability may be extinguished in the event his or her contractual promise becomes objectively impossible to perform. There are two kinds of impossibility: original and supervening; supervening impossibility develops after the contract in question is formed. Although absolute impossibility is not required, there must be a showing of impracticability because of extreme and unreasonable difficulty, expense, injury or loss involved.
>
> > The question whether a promisor's liability is extinguished in the event his contractual promise becomes objectively impossible to perform may depend upon whether the supervening event producing impossibility was or was not reasonably foreseeable when he entered into the contract. Risk of nonperformance of a contract should not fairly be thrown upon the promisor, if an unanticipated circumstance had made performance of the promise vitally different from what should reasonably have been within the contemplation of both parties when they entered into the contract.
>
> [*Roberts v Farmers Ins Exch*, 275 Mich App 58, 73-74; 737 NW2d 332 (2007) (quotation marks, citations, and italics omitted).]

For a supervening event to discharge a duty, "the non-occurrence of that event must have been a 'basic assumption' on which both parties made the contract." Restatement Contracts, 2d, § 261. "The continuation of existing market conditions and of the financial situation of the parties are ordinarily not such assumptions, so that mere market shifts or financial inability do not usually effect discharge." Restatement Contracts, 2d, § 261. In other words, typically, "[s]ubsequent events which in the nature of things do not render performance impossible, but only render it more difficult, burdensome, or expensive, will not operate to relieve the contractor." *Chase v Clinton Co*, 241 Mich 478, 484; 217 NW 565 (1928). Moreover, "if the performance remains practicable and it is merely beyond the party's capacity to render it, he is ordinarily not discharged." Restatement Contracts, 2d, § 261, comment *e*.

In this case, the trial court's impossibility finding is not entirely clear. With regard to impossibility, the trial court stated:

-10-

Further, you have whether or not it's impossible to perform the agreement as drafted. It was drafted after a considerable period of time. And it's different from the *Lentz* case in the sense that this was drafted years ago and things changed.

Although the trial court did not thoroughly explain its reasoning, when the trial court's statement is considered in light of the parties' closing arguments, the trial court appeared to be adopting one of Thomas's arguments in the trial court, namely—that, regardless of what the parties thought when they signed the agreement in 2016, it was currently financially impossible for him to comply with the portion of the agreement requiring him to pay spousal support to Dolores, particularly in light of Thomas's age and ability to keep working in the future.

Thomas's argument wholly lacks merit, and the trial court erred by finding impossibility. Thomas has identified nothing but a potential future change in circumstances that may affect his financial ability to pay spousal support for the 34 months provided in the agreement. However, financial inability or a party's capacity to perform does not ordinarily support an impossibility defense. See Restatement Contracts, 2d, § 261. Moreover, in this case, although Thomas argues that he cannot be expected to work forever, the fact remains that he is *still currently working*. There is, in other words, currently no supervening event whatsoever and no basis to conclude that his performance is impossible. See *Roberts*, 275 Mich App at 73-74. Even if Thomas does retire in the future, again, a more burdensome obligation or a financial difficulty does not typically constitute impossibility that excuses performance of a contract. See Restatement Contracts, 2d, § 261; *Chase*, 241 Mich at 484. Finally, it should be noted that the settlement does *not* state that spousal support is nonmodifiable. Generally, a spousal support obligation is modifiable under MCL 552.28. However, divorcing parties may enter into a settlement agreement to "forgo their statutory right to petition for modification of an agreed-upon alimony provision, and to clearly express their intent that the alimony provision is final, binding, and thus nonmodifiable." *Staple v Staple*, 241 Mich App 562, 568; 616 NW2d 219 (2000). The parties in this case did not include such a provision, meaning that the spousal support remains modifiable under MCL 552.28. In these circumstances, it is baseless to argue that Thomas's age or the possibility of Thomas's future retirement renders it impossible for him to comply with the agreement. The trial court erred by finding impossibility.

## H. DURESS

"Duress exists when one, by the unlawful act of another, is induced to make a contract or perform some act under circumstances which deprive him of the exercise of free will." *Apter v Joffo*, 32 Mich App 411, 416; 189 NW2d 7 (1971) (quotation marks and citation omitted). "To successfully demonstrate duress, a party must show that they were illegally compelled or coerced to act by fear of serious injury to their persons, reputations, or fortunes." *Skaates v Kayser*, 333 Mich App 61, 78; 959 NW2d 33 (2020) (quotation marks and citation omitted). "The law does not recognize duress by mere suggestion, advice, or persuasion, especially where the parties are at arm's length and represent opposing interests." *Clement v Buckley Mercantile Co*, 172 Mich 243, 253; 137 NW 657 (1912). When claiming duress on the basis of threats or intimidation, "it must appear that the party coerced was so intimidated and moved by the threats made as to cease to be a free moral agent, and became so bereft of those qualities of the mind essential to entering into a contract as to be incapacitated to exercise his free will power in that connection." *Id*.

The condition of mind of a person produced by threats of some kind, rendering him incapable of exercising his free will, is what constitutes duress. The means used to produce that condition, the age, sex, and mental characteristics of the alleged injured party, are all evidentiary, merely, of the ultimate fact in issue, of whether such person was bereft of the free exercise of his will power. [*Id*. (quotation marks and citation omitted).]

"As a rule, duress will not prevail to invalidate a contract entered into with full knowledge of all the facts, with ample time and opportunity for investigation, consideration, consultation, and reflection." *Id*. at 255. "A change of heart is normally insufficient to justify the setting aside of a settlement agreement." *Groulx v Carlson*, 176 Mich App 484, 492; 440 NW2d 644 (1989).

In this case, with regard to duress, the trial court stated:

As to—if I may just a moment here. And simply, you know, Black's Law Dictionary, I love Black's Law Dictionary sixth Edition, there's probably a newer edition but that's all I have at home. A contract entered into under duress, a party's manifestation of assent to a contract if it's induced by an improper threat by the other party, it leaves the victim no reasonable alternative. The contract is voidable by the victim. And that's the restatement (second) of contracts. I think as we all understand.

I haven't looked at the restatement (second) of contracts since law school, quite frankly. And it's amazing that it's still the same, that if there's an improper threat by the other party. And that being, you know, the sale of everything, unless you sign it.

The trial court appeared to believe that an "improper threat," on its own, without consideration of any of the surrounding circumstances, was enough to constitute duress. However, this is not the standard in Michigan. See *Clement*, 172 Mich at 253. Applying the correct standard, there is no evidence in this case that Thomas ceased "to be a free moral agent." *Id*. That is, the undisputed facts show that Thomas and Dolores discussed the settlement over several meetings, and Thomas had input into the settlement agreement. Thomas is a well-educated professional, running a dental practice. During the settlement discussions and before signing the agreement, Thomas was also free, and he knew that he was free, to consult an attorney or seek advice from anyone he wanted. He chose not to do so. Although maintaining that he felt "intimidated" because Dolores threatened to sell properties if he did not sign, Thomas acknowledged that he was not forced to sign and that he did not have a "gun to [his] head." Even fully accepting Thomas's version of events,[6] his description does not support that he ceased to be a free moral agent or that he was incapable of exercising his free will. See *id*. Instead, from his own account, it is clear that

---

[6] Dolores denied threatening Thomas in any way, but the trial court credited Thomas's testimony that a threat to sell the properties was made.

he signed the contract "with full knowledge of all the facts, with ample time and opportunity for investigation, consideration, consultation, and reflection." *Id*. at 255.

On this record, Thomas failed to show duress. Indeed, Thomas conceded in the trial court, and he again concedes on appeal that he did not sign the contract under duress.[7] To the extent the trial court concluded Thomas was subject to duress, the trial court erred. And ultimately, in the absence of fraud, duress, mutual mistake, or severe stress, the trial court erred by refusing to enforce the settlement agreement. See *Lentz*, 271 Mich App at 474-475, 478.

Reversed and remanded for enforcement of the settlement agreement. We do not retain jurisdiction. Defendant may tax costs.

/s/ James Robert Redford
/s/ David H. Sawyer
/s/ Christopher M. Murray

---

[7] On appeal, rather than argue that he was subject to duress, Thomas argues for the first time that he was subjected to undue influence. By failing to raise this issue below, Thomas has waived this argument. See *Walters*, 481 Mich at 387-388. In any event, this argument lacks merit. Considering the circumstances as a whole, Thomas has failed to show that he was subject "to threats, misrepresentation, undue flattery, fraud, or physical or moral coercion sufficient to overpower volition, destroy free agency, and impel [him] to act against [his] inclination and free will." *McPeak v McPeak*, 233 Mich App 483, 496; 593 NW2d 180 (1999). As discussed, Thomas and Dolores engaged in settlement discussions over several meetings, and by his own admission, Thomas had input in the settlement. Thomas was an educated individual, who was free to consult an attorney. He testified that he felt "threatened" by Dolores, but he nevertheless acknowledged that he was not forced to sign the agreement and that Dolores did not have a gun to his head. He was, in other words, "mentally competent and knew exactly what he was doing." See *Foshee v Krum*, 332 Mich 636, 644; 52 NW2d 358 (1952). He has not established undue influence.