*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

KYLE MICHAEL KELLEY,

       Plaintiff-Appellant,

v

ELIZABETH ANN KELLEY,

       Defendant-Appellee.

UNPUBLISHED
January 11, 2024

No. 364517
Antrim Circuit Court
LC No. 20-8488-DM

Before: BOONSTRA, P.J., and O'BRIEN and SWARTZLE, JJ.

PER CURIAM.

Plaintiff appeals by right the portion of the trial court's January 5, 2023 judgment of divorce granting defendant sole legal custody and primary physical custody of the parties' three minor children—AK, LK, and BK. We affirm.

## I. PERTINENT FACTS AND PROCEDURAL HISTORY

The procedural history of this case is extremely lengthy, spanning nearly three years from the filing of the complaint for divorce until the entry of judgment. Each party was represented by two attorneys, the children were appointed a lawyer-guardian ad litem, and even several of the educational providers subpoenaed as witnesses were forced to seek the advice of counsel. The record contains well over a thousand pages of transcripts and many hundreds more pages of motions, briefs, records, and exhibits. Nine evidentiary hearings were held in front of the referee, followed by a four-day de novo review hearing and several additional hearings before the trial court, before the judgment of divorce was finally entered. Rather than provide an excessively long chronological narrative of the underlying facts, this Court will endeavor to provide an overview of the events below that support our ultimate conclusion.

### A. BACKGROUND AND EVENTS OF FEBRUARY 7, 2020

The parties were married in 2011 in Erie County, New York. They moved to Michigan in 2017. The parties have three minor children. Before their separation, plaintiff primarily worked as a heating and ventilation, air conditioning, and refrigeration technician to support the family while defendant stayed at home with the children. This arrangement was a source of conflict

between the parties, as plaintiff believed that defendant needed to also work to support the family, while defendant believed that any earnings she made would essentially be offset by the cost of childcare.

On February 7, 2020, the parties argued over defendant's decision to pay for a babysitter for their then-two children (defendant being pregnant with BK at the time) and having her hair done at a salon. That evening, plaintiff's employer sent plaintiff to Crossroads, a strip club, to repair a beverage cooler. After completing the job, plaintiff decided to stay and have food and drinks. Defendant became upset when plaintiff was gone longer than he had said he would be, and she became further upset when she checked their bank account to discover that defendant had spent money at Crossroads. When plaintiff arrived home, the parties continued to argue. Defendant testified that she believed plaintiff was intoxicated, while plaintiff testified to having had three beers and not being impaired. At some point, defendant went to the garage and obtained one of plaintiff's handguns. Defendant testified that she was holding the gun and considering suicide when plaintiff found her, at which point she tossed or dropped the gun on the ground. Plaintiff testified that defendant put the gun in her mouth and also aimed the gun at him with her finger on the trigger. Both parties called 911. A police officer who arrived on the scene, Officer Robert Oliverius, testified that he observed plaintiff and believed he had been drinking. Officer Oliverius also noted that plaintiff was highly animated, disheveled, and upset, and that plaintiff told him several different versions of how he obtained the gun from defendant; these explanations included that he took it from her, that she "tossed" the gun to him, and that he ordered her to drop the gun and she threw it on the couch. Plaintiff never told Officer Oliverius that defendant pointed the gun at him or had her finger on the trigger, but he did make one statement about defendant having the gun in her mouth.

### B. COMPLAINT FOR DIVORCE, PPO, AND VISITATION

Defendant agreed to a voluntary admission to Munson Hospital for in-patient psychiatric treatment. While defendant was in the hospital, plaintiff obtained an ex parte personal protection order (PPO). Plaintiff served defendant with both the PPO and his complaint for divorce on February 13, 2020. AK and LK initially stayed with plaintiff in the marital home, while defendant moved into a hotel room with her mother. Plaintiff attended a few supervised visits with defendant in February and March 2020; the visitation procedure was complicated by the start of the COVID-19 pandemic. On March 23, 2020, the trial court entered a temporary order for custody, parenting time, and child support, granting the parties joint legal and physical custody of AK and LK and granting defendant the use of the marital home. Plaintiff moved in with his parents. The PPO was eventually dismissed in March 2020 and replaced with a mutual restraining order prohibiting the parties from contacting the other except concerning the children.

The parties' relationship throughout the next nearly two years can best be described as antagonistic. Initially, the parties exchanged the children at Safe Haven, a facility designed to provide a safe and secure environment for such exchanges. However, plaintiff and his mother had numerous verbal altercations with staff over a variety of minor delays or changes to the routine, many of them caused by the COVID-19 pandemic. This ultimately led Safe Haven staff to ban plaintiff from exchanges at Safe Haven. Safe Haven staff also noted numerous derogatory statements made by plaintiff and his mother about staff in the presence of the children. During times when Safe Haven was closed for COVID-related reasons, and after plaintiff was banned, the

parties conducted parenting-time exchanges at a gas station. Defendant's neighbor, Julie Greene, who accompanied defendant to these exchanges, noted several times that plaintiff insulted defendant in front of the children, including calling her lazy, a "bitch," a "squatter" in plaintiff's house, and calling her "Miss Piggy" and making "oinking" sounds. Greene also observed plaintiff tell his children that "the nightmare's almost over" when they returned from a visit with defendant. Green testified that plaintiff mocked defendant's suicide threat at least once. Plaintiff and his mother also formed a belief, and testified to it, that other patrons of the gas station had been enlisted by defendant to watch the exchanges. Plaintiff's mother filmed several other patrons whom she believed were in league with defendant, and got into a verbal altercation with at least one of them.

## C. AK AND LK'S EDUCATION

The parties also had significant conflicts over AK and LK's participation in educational programs, most notably the "Early On" program for children with developmental delays. Both parties canceled Early On appointments without providing notice to the other. Plaintiff had significant conflicts with Joanna Brown, an Early On service provider, and her supervisor. Plaintiff stated several times that he believed Brown was biased in favor of defendant. Brown testified that she had never dealt with a parent as consistently agitated as plaintiff. Plaintiff ultimately requested that all Early On services be canceled. Brown and another Early On service provider, Anne White, testified that plaintiff had spoken negatively about defendant in front of the children more than once, including calling her a drug addict and inquiring as to whether defendant was at fault for their children's developmental delays. The parties also had significant disagreements over whether AK should attend preschool, ultimately resulting in AK attending preschool during defendant's parenting time but not during plaintiff's. The parties also disagreed about whether LK should attend a special school for children with autism.

## D. AK AND LK'S MEDICAL CARE

The parties were extremely at odds concerning AK and LK's medical care. Before the divorce, the children received medical treatment from Dr. Jennifer Shockley, a family practitioner who is not a pediatrician but who has pediatric patients and had done pediatric rotations as part of her medical training. While defendant was in the hospital, plaintiff took AK and LK to see Dr. Maureen Street, also a family practitioner. Dr. Street testified that she referred both girls to Pine Rest for assessment of speech and developmental issues. Plaintiff repeatedly canceled appointments defendant had made with Dr. Shockley, including the "well child" examinations required for preschool, and even had his attorneys send Dr. Shockley a letter stating that her treatment of AK and LK had not been approved by the court (although the trial court had not ordered that the children see a particular physician) and demanding that she cancel an upcoming appointment. Dr Street testified that plaintiff's mother informed her that she had been court-ordered to treat AK and LK, which was untrue. Dr. Street ultimately refused to continue treating the children after being repeatedly involved in the parties' litigation, including receiving numerous requests for medical records and letters and calls from the parties' attorneys. Dr. Street testified that the parties attempted to attend one of the children's medical appointments together in October 2020, but that the office staff had to stop the parties from fighting. Defendant testified that, at this appointment, plaintiff called her a "psycho" and told her to kill herself; these statements were made in front of AK and LK.

## E. BK

BK was born in August 2020. Plaintiff was not present for the birth; defendant testified that the COVID-19 restrictions in place at the time permitted only one additional person to be in the delivery room, and she had chosen her mother. Before BK's birth, plaintiff told defendant that he thought BK was not his child. Plaintiff requested a paternity test at one point, although he testified that none was ever performed. Rather, plaintiff became convinced that BK was his son when he saw him after his birth and observed the physical resemblance.

Plaintiff had wanted to give BK a different name; defendant chose BK's name unilaterally after she gave birth. Plaintiff refused to use BK's name, testifying that he only referred to him as "my son." Plaintiff filed a motion with the trial court requesting that the court order that BK be renamed; that motion was denied. At the hearing on plaintiff's motion to enter a judgment of divorce in December 2022 (the last hearing before the entry of the judgment of divorce), defendant informed the trial court that plaintiff had recently shaved BK's head down to the bare skin, and had repeatedly cut the children's hair extremely short as retaliation for perceived unfairness in the divorce proceedings; plaintiff's counsel alleged that this was merely a "summer shave." The trial court noted that it had "never seen a case like this, where one parent shaves the head of" a two year old, noted that BK looked like "he has cancer and he's undergoing chemo," and stated that "this establishes why I ordered that before I ever review a determination as to legal custody [plaintiff] needed to have a psychological evaluation."

## F. PLAINTIFF'S ALLEGATIONS OF DRUG ABUSE

Plaintiff subpoenaed numerous medical professionals who had treated defendant over the years, and presented evidence concerning medications that defendant had been prescribed during those years. Plaintiff particularly focused on defendant's prescribed use of Tramadol for pain management, noting that it was considered an opioid. Dr. Shockley testified to prescribing defendant Tramadol and stated that she had no concerns regarding potential substance abuse by defendant, noting that Tramadol was "a very mild member" of the opioid class of drugs. Dr. Shockley also testified to having prescribed cough syrup containing codeine to defendant in May 2018. Defendant testified to having been prescribed a limited amount of opiate-based painkillers after LK's birth by C-section. During a hearing in January 2021, plaintiff interrupted his own counsel to say, "we want to talk to these doctors about [defendant] popping pills," causing the trial court to reprimand him. Plaintiff also testified that defendant had told him she had attempted to overdose on sleeping pills in 2009. Plaintiff testified that defendant abused opiates while they were dating, but he admitted that defendant did not abuse opiates after the parties were married.

## G. REFEREE RECOMMENDATION

Following nine days of hearings in this case, the referee issued a recommendation and proposed custody and support order. The referee recommended a continuation of the existing joint legal custody and current physical custody and parenting time order. The referee noted that "[t]his case has been extremely and unnecessarily contentious. The actual facts are not particularly complicated; the parties and their attorneys have engaged in every effort to obfuscate the issues with incessant filings and demonstrated rancor."

## H. DE NOVO REVIEW AND TRIAL COURT HOLDING

Both parties objected to the referee's proposed order. As stated, the trial court held an extensive de novo review hearing over several days. At the de novo hearing, plaintiff presented the testimony of several of plaintiff's medical providers concerning the nature and reason for every medication plaintiff had been prescribed over the past several years. Following the de novo review hearing, the trial court granted the parties a divorce and held that defendant would have sole legal custody and primary physical custody of the children. Finally, on January 5, 2023, nearly three years after the filing of a complaint for divorce on February 13, 2020, the trial court entered a judgment of divorce.

This appeal followed.[1]

## II. STANDARD OF REVIEW

"To expedite the resolution of a child custody dispute by prompt and final adjudication, all orders and judgments of the circuit court shall be affirmed on appeal unless the trial judge made findings of fact against the great weight of evidence or committed a palpable abuse of discretion or a clear legal error on a major issue." MCL 722.28; see also *Pierron v Pierron*, 486 Mich 81, 85; 782 NW2d 480 (2010).

A trial court's finding is against the great weight of the evidence when it is so contrary to the weight of the evidence that it is unwarranted or is so plainly a miscarriage of justice that it would warrant a new trial. *Fletcher v Fletcher*, 447 Mich 871, 877-878; 526 NW2d 889 (1994). This standard applies to all findings of fact, see *Hunter v Hunter*, 484 Mich 247, 257; 771 NW2d 694 (2009), which includes findings regarding the existence of an established custodial environment, see *Corporan v Henton*, 282 Mich App 599, 605; 766 NW2d 903 (2009), and the findings concerning each custody factor, see *Berger v Berger*, 277 Mich App 700, 705; 747 NW2d 336 (2008). The trial court's findings of fact must be affirmed unless the evidence clearly preponderates in the other direction. *Mitchell v Mitchell*, 296 Mich App 513, 519; 823 NW2d 153 (2012). In reviewing factual findings, this Court defers to the trial court's determinations of credibility. *Shann v Shann*, 293 Mich App 302, 305; 809 NW2d 435 (2011).

This Court reviews a trial court's discretionary rulings in a custody dispute for a palpable abuse of discretion. See MCL 722.28; *Shulick v Richards*, 273 Mich App 320, 324-325; 729 NW2d 533 (2006). "An abuse of discretion exists when the trial court's decision is so palpably and grossly violative of fact and logic that it evidences a perversity of will, a defiance of judgment, or the exercise of passion or bias." *Berger*, 277 Mich App at 705.

---

[1] We stress again that even this rather-detailed recitation of the facts and proceedings below is far from comprehensive. The parties can be assured that this Court, in making its decision, reviewed and considered all of the materials they filed on appeal.

This Court reviews de novo the trial court's application of the law to the facts, to determine if the trial court committed clear legal error. See *Kaeb v Kaeb*, 309 Mich App 556, 564; 873 NW2d 319 (2015).

## III. ANALYSIS

Plaintiff argues that the trial court erred by awarding defendant sole legal and primary physical custody of the children, because many of the court's findings were against the great weight of the evidence. We disagree.

## A. GENERAL LEGAL PRINCIPLES

The Child Custody Act of 1970, MCL 722.21 *et seq.,* governs the resolution of most custody disputes in Michigan. See *Mauro v Mauro,* 196 Mich App 1, 4; 492 NW2d 758 (1992). The purpose of the Act is to promote the best interests and welfare of children and courts must construe it liberally to serve that purpose. See MCL 722.26(1); *Frame v Nehls*, 452 Mich 171, 176; 550 NW2d 739 (1996).

In all custody disputes, "the best interests of the child control" the trial court's decisions. MCL 722.25(1). Therefore, trial court must resolve custody disputes by determining what is in the child's best interest. *Eldred v Ziny*, 246 Mich App 142, 150; 631 NW2d 748 (2001).

As the first step to resolving a custody dispute, a trial court must generally determine whether the child had an established custodial environment with either or both parents. *Jack v Jack*, 239 Mich App 668, 670; 610 NW2d 231 (2000). A child has an established custodial environment "if over an appreciable time the child naturally looks to the custodian in that environment for guidance, discipline, the necessities of life, and parental comfort." MCL 722.27(1)(c). A child may have more than one custodian and more than one custodial environment. See *Berger*, 277 Mich App at 707.

If either parent requests joint custody, the trial court must consider it. See MCL 722.26a(1); see also *Wright v Wright,* 279 Mich App 291, 299; 761 NW2d 443 (2008), *Shulick*, 273 Mich App at 326. The court must determine whether joint custody is in the child's best interests by examining the best interest factors set forth in MCL 722.23, see MCL 722.26a(1)(a), and by determining whether the "parents will be able to cooperate and generally agree concerning important decisions affecting the welfare of the child," MCL 722.26a(1)(b). See also *Dailey v Kloenhamer*, 291 Mich App 660, 667; 811 NW2d 501 (2011). However, when parents have a "deep-seated animosity" between them that causes them to have an "irreconcilable divergence in their opinions about how to foster [the] child's well-being," joint custody ceases to be an option. *Wright*, 279 Mich App at 299-300, citing MCL 722.26a(1)(b). In such cases, the trial court should order that one parent have sole custody.

The trial court must explicitly consider the factors set forth in MCL 722.23 when determining if a change in custody is in the child's best interests. The factors that must be considered are:

> (a) The love, affection, and other emotional ties existing between the parties involved and the child.

(b) The capacity and disposition of the parties involved to give the child love, affection, and guidance and to continue the education and raising of the child in his or her religion or creed, if any.

(c) The capacity and disposition of the parties involved to provide the child with food, clothing, medical care or other remedial care recognized and permitted under the laws of this state in place of medical care, and other material needs.

(d) The length of time the child has lived in a stable, satisfactory environment, and the desirability of maintaining continuity.

(e) The permanence, as a family unit, of the existing or proposed custodial home or homes.

(f) The moral fitness of the parties involved.

(g) The mental and physical health of the parties involved.

(h) The home, school, and community record of the child.

(*i*) The reasonable preference of the child, if the court considers the child to be of sufficient age to express preference.

(j) The willingness and ability of each of the parties to facilitate and encourage a close and continuing parent-child relationship between the child and the other parent or the child and the parents. A court may not consider negatively for the purposes of this factor any reasonable action taken by a parent to protect a child or that parent from sexual assault or domestic violence by the child's other parent.

(k) Domestic violence, regardless of whether the violence was directed against or witnessed by the child.

(*l*) Any other factor considered by the court to be relevant to a particular child custody dispute. [MCL 722.23.]

When resolving a custody dispute, the trial court must consider and explicitly state its findings and conclusions regarding each factor. See *Rittershaus v Rittershaus*, 273 Mich App 462, 475; 730 NW2d 262 (2007). However, the court need not comment on every matter in evidence or declare whether it accepted or rejected every proposition argued. See *Baker v Baker*, 411 Mich 567, 583; 309 NW2d 532 (1981). The record need only be sufficient for an appellate court to determine whether the evidence clearly preponderates against the trial court's findings. See *MacIntyre v MacIntyre (On Remand)*, 267 Mich App 449, 452; 705 NW2d 144 (2005). A trial court is also not required to give equal weight to all the factors; it may consider the relative weight of the factors as appropriate to the circumstances. See *Sinicropi v Mazurek*, 273 Mich App 149, 184; 729 NW2d 256 (2006).

## B. BEST-INTEREST FACTORS

In this case, the trial court found that factors (a), (h) and (j) favored defendant, factor (g) favored plaintiff, and all other factors favored both parties (or neither party). Plaintiff argues that the trial court's findings under factors (a), (b), (c), (f), (h), and (j)[2] were against the great weight of the evidence. We disagree.

## 1. FACTOR (A)

Factor (a) concerns "[t]he love, affection, and other emotional ties existing between the parties involved and the child." MCL 722.23(a). The trial court, while acknowledging that both parties appeared to love their children, found that this factor favored defendant, primarily because of plaintiff's conduct toward BK. Despite plaintiff's claim to the contrary, the trial court's finding was not solely based on plaintiff's questioning of BK's paternity prior to his birth. Rather, the record shows that the trial court based its determination on plaintiff's refusal to use BK's name, and on plaintiff questioning his paternity *while simultaneously* seeking sole legal and primary physical custody of BK. The trial court also noted plaintiff's insinuations that he might not be AK's or LK's father. The trial court's finding was not against the great weight of the evidence. *Fletcher*, 447 Mich at 877-878. In fact, although the trial court discussed plaintiff's animosity toward defendant in addressing other factors, the record is replete with instances in which plaintiff was willing to make his children unhappy, or even delay medical treatment or educational programs, in order to inconvenience or somehow score a "win" over defendant. This conduct supports the inference that plaintiff's emotional ties to his children are weaker than his anger towards his ex-wife, among other things. See *Fletcher (After Remand)*, 229 Mich App at 25 (noting that "some factors have natural overlap").

## 2. FACTOR (B)

Factor (b) concerns "[t]he capacity and disposition of the parties involved to give the child love, affection, and guidance and to continue the education and raising of the child in his or her religion or creed, if any." MCL 722.23(b). The trial court noted that both parties had the capacity to provide love and affection for the children. However, it also noted the great deal of evidence that plaintiff frequently became angry and could not control his behavior, as the trial court itself observed at court hearings. The trial court noted that plaintiff's anger resulted in his being banned from Safe Haven, limiting his ability to participate in parenting-time exchanges. For many of the same reasons as stated in our discussion of factor (a), the trial court's finding was not against the great weight of the evidence. *Fletcher*, 447 Mich at 877-878. Further, although plaintiff attempts to explain his behavior as simple frustration and "having human emotions," and argues that the trial court merely allowed its "personal opinion" to influence its findings, the record shows clearly

---

[2] Although plaintiff asserts in his brief on appeal that the trial court's findings under factor (l) were against the great weight of the evidence, he provides no argument or citation to authority in support of that assertion. "It is not sufficient for a party 'simply to announce a position or assert an error and then leave it up to this Court to discover and rationalize the basis for his claims, or unravel and elaborate for him his arguments, and then search for authority either to sustain or reject his position.' " *Wilson v Taylor*, 457 Mich 232, 243; 577 NW2d 100 (1998) (citation omitted).

that plaintiff had aggressive or angry confrontations with nearly everyone involved in caring for his children during the pendency of this case, often in front of AK and LK.

### 3. FACTOR (C)

Factor (c) concerns "[t]he capacity and disposition of the parties involved to provide the child with food, clothing, medical care or other remedial care recognized and permitted under the laws of this state in place of medical care, and other material needs." MCL 722.23(c). The trial court found that this factor favored both parties equally, as both of the parties had the capacity and disposition to provide the children with their basic material needs and medical care. We agree. The record shows extensive and contentious disagreement between the parties over the children's medical treatment, with both parties at times conducting themselves poorly, such as when they argued in Dr. Street's office, or when they canceled appointments the other had made. But plaintiff's argument is essentially that his opinion concerning which medical providers should treat the children is correct, and that defendant's opinion is incorrect, and that the trial court therefore should have found that this factor favored him. The type of medical care a child should receive is a complex and difficult question at times, and the record shows that both parents, despite their disagreements, were extremely invested in making sure their children received what they viewed as proper care. Further, although plaintiff argues that the trial court erred because defendant has "mismanaged her own health," the evidence plaintiff cites in support of this argument is either decades old (such as plaintiff's claim that defendant did not always properly take medication she was prescribed while living in New York), or irrelevant (such as plaintiff's claim that defendant's prescribed use of Tramadol, a mild painkiller, for carpal tunnel syndrome and menstrual cramps was the behavior of a "drug addict" seeking "round after round of painkillers"). The trial court's finding on this factor was not against the great weight of the evidence. *Fletcher*, 447 Mich at 877-878.

### 4. FACTOR (F)

Factor (f) concerns "[t]he moral fitness of the parties involved." MCL 722.23(f). The trial court found that this factor favored both parties (or, perhaps more accurately, neither party), noting that there was evidence that defendant had abused opiates in the past and there was also evidence that plaintiff had abused alcohol in the past, but that the evidence was "a considerable period of time ago." This finding was not against the great weight of the evidence. Defendant's treatment for opiate addiction, and plaintiff's conviction for operating a vehicle under the influence of alcohol, both occurred before the birth of their children. None of defendant's medical providers testified to any current concerns with defendant regarding controlled substance abuse and, despite plaintiff's efforts to raise concerns about defendant's use of Tramadol, no evidence was presented that defendant's ability to care for her children was ever impaired. Similarly, although the evidence showed that plaintiff was at least somewhat intoxicated on the night of February 7, 2020, and defendant testified to having been concerned about plaintiff's drinking in the past, there was no evidence presented that plaintiff had a current problem with alcohol or that alcohol use would impair his ability to parent his children. The trial court's finding was not against the great weight of the evidence. *Fletcher*, 447 Mich at 877-878.

### 5. FACTOR (H)

Factor (h) concerns "[t]he home, school, and community record of the child." MCL 722.23(h). The trial court found that this factor favored defendant, noting plaintiff's repeated conflicts with educational providers, especially employees of Early On. The trial court noted that plaintiff had directed his attorneys to send numerous "threatening letters" to many service providers. The record shows that plaintiff was frequently angry and adversarial toward female service providers whom he believed were "biased" against him, including Joanna Brown, her supervisor, and the staff of Safe Haven. The trial court noted that plaintiff's actions were primarily responsible for AK and LK not participating in Early On as much as they could have before they "aged out" of the program. While plaintiff argues that this actions simply show his zealous advocacy for the best possible education for his children, the record shows that his actions frequently hampered and delayed AK and LK's access to programs and services that could have benefitted them significantly. The trial court finding was not against the great weight of the evidence. *Fletcher*, 447 Mich at 877-878.

## 6. FACTOR (J)

Factor (j) concerns "[t]he willingness and ability of each of the parties to facilitate and encourage a close and continuing parent-child relationship between the child and the other parent or the child and the parents." MCL 722.23(j). The trial court found that this factor did not favor either party, or "maybe slightly" favored defendant. This finding was not against the great weight of the evidence. The record shows that the communication between the parties was abysmal. While both parties shared some of that blame, the record shows that plaintiff insulted defendant frequently, publicly, and often in front of the children. Further, plaintiff was unwilling to use the My Family Wizard tool for communication, even after being court-ordered to do so, until shortly before the divorce was finalized. Plaintiff expressed no compelling reason for this refusal, stating only that it was "ridiculous" and claiming that the parties should be able to communicate via text message or phone. However, the record also shows that plaintiff would not respond to defendant's text communication, and even accused her of violating the mutual restraining order, forcing all communication to go through the parties' attorneys. If anything, the trial court's finding concerning this factor was rather generous to plaintiff; the evidence certainly did not preponderate against it. *Fletcher*, 447 Mich at 877-878.

## C. CONCLUSION

Plaintiff has not demonstrated that any of the trial court's findings regarding the challenged best-interest factors were against the great weight of the evidence. Moreover, the record clearly shows that the parties possess "deep-seated animosity" between them that causes them to have an "irreconcilable divergence in their opinions about how to foster" their children's wellbeing. *Wright*, 279 Mich App at 299-300, citing MCL 722.26a(1)(b). The record is replete with instances in which the referee and the trial court urged the parties to attempt to find some means of working together for the good of the children, rather than dragging them, and each other, through years of exhausting (and expensive) litigation. Those urgings fell on deaf ears. It would have been decidedly *against* the children's best interests to allow the parties to share in the decisions concerning their upbringing, with one party setting appointments only to have the other cancel them, and every decision turned into a battle, a battle that would likely lead the parties back before the trial court on a regular basis. Accordingly, the trial court did not abuse its discretion by determining that sole legal custody and primary physical custody with one parent was in the

-10-

children's best interests.  *Id.*  And it did not abuse that discretion by determining that defendant was the better choice in that regard.

Affirmed.


/s/ Mark T. Boonstra
/s/ Colleen A. O'Brien
/s/ Brock A. Swartzle