*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

JEREMY ROBERT GIORDANA,

      Plaintiff-Appellee,

v

JENNA RAE GIORDANA,

      Defendant-Appellant.

UNPUBLISHED
May 27, 2025
2:46 PM

Nos. 370808; 372323
Marquette Circuit Court
Family Division
LC No. 16-054915-DM

Before: MARIANI, P.J., and MALDONADO and YOUNG, JJ.

PER CURIAM.

In Docket No. 370808, defendant-mother, Jenna Rae Giordana, appeals by leave granted[1] an order denying her request for a medical evaluation of plaintiff-father, Jeremy Robert Giordana. In Docket No. 372323, defendant-mother appeals as of right an order that changed the parenting-time schedules of the parties and awarded sole legal custody to plaintiff-father. We affirm.

## I. FACTUAL BACKGROUND

The parties divorced in 2017 and have three minor children, EG1, FG, and EG2. For years, the custody arrangement was 50/50 in that both parties shared equally in physical and legal custody. But in 2022, defendant-mother ceased bringing the children for plaintiff-father's parenting time, unilaterally withdrew them from the Marquette Public Schools, and began homeschooling them so that plaintiff-father would not be able to pick them up from school for parenting time. Plaintiff-father went nearly two years without spending any time with or speaking with the children, even though the custody arrangement remained unchanged. Defendant-mother contended that plaintiff-father had been abusing the children, but numerous Children's Protective Services (CPS) and criminal investigations failed to substantiate any abuse. Eventually, plaintiff-father brought a motion to show cause as to why defendant-mother should not be held in civil contempt for violating the custody order, requested the trial court award him make-up parenting

---

[1] See *Giordana v Giordana*, unpublished order of the Court of Appeals, entered September 17, 2024 (Docket No. 370808).

time, and requested the trial court find a change of circumstances for it to review the current custody and parenting-time orders. In response, defendant-mother brought a motion for change of custody, requesting sole physical and sole legal custody.

Early in these proceedings, defendant-mother sought to have the court order plaintiff-father to undergo a medical examination because he has the genetic markers for Huntington's disease (HD), a neurologic, fatal disorder affecting the brain, which can cause serious psychological problems, including anxiety, depression, irritability, aggression, and cognitive issues with organizing, planning, multitasking, and memory issues. HD can also cause physical problems such as involuntary movements, inability to balance, problems with speech, and problems swallowing. The disease progressively manifests itself over the span of 15-20 years, on average. Defendant-mother alleged plaintiff-father's parenting time should be decreased on the basis of symptoms of HD. The trial court concluded, after hearing testimony from two neurologists, and plaintiff-father's primary care physician (PCP), Dr. Spring Madosh, that an examination was not warranted because plaintiff-father was not yet exhibiting symptoms of HD.

During the two days of hearings regarding custody, the trial court heard testimony from plaintiff-father, defendant-mother, EG1, FG, plaintiff-father's sister, CPS investigators and police officers, the children's school principal, and the owner of the children's daycare, and considered deposition testimony of EG1's therapist Gwen Storm. Plaintiff-father presented evidence that defendant-mother had intentionally alienated the children from him and had manufactured evidence of abuse.

The trial court found the claims of abuse to be lacking in credibility and concluded that defendant-mother had intentionally interfered with the relationship between plaintiff-father and the children, and "tended to manipulate the children." It entered a custody order whereby the children would attend the Marquette Public Schools and would phase into having alternate-weekend parenting time with plaintiff-father, with more time in the summers. It concluded that although defendant-mother would have primary physical custody, sole legal custody with plaintiff-father was appropriate in light of defendant-mother's past behavior.

Defendant-mother now appeals the order denying her request that plaintiff-father undergo a medical examination and the order changing custody.

## II. MEDICAL EXAMINATION

On appeal, defendant-mother contends that the trial court erred by failing to order a medical examination of plaintiff-father. A decision about whether to order a medical examination is reviewed for an abuse of discretion. *Burris v KAM Transport, Inc (On Remand)*, 301 Mich App 482, 487; 836 NW2d 727 (2013).

MCR 2.311 dictates when a trial court may order a medical or other type of examination, as requested here by defendant-mother. MCR 2.311 states, in part:

> **(A) Order for Examination.** When the mental or physical condition (including the blood group) of a party, or of a person in the custody or under the legal control of a party, is in controversy, the court in which the action is pending *may* order the party to submit to a physical or mental or blood examination by a

physician (or other appropriate professional) or to produce for examination the person in the party's custody or legal control. The order may be entered only on motion for good cause with notice to the person to be examined and to all parties. The order must specify the time, place, manner, conditions, and scope of the examination and the person or persons by whom it is to be made. . . . (Emphasis added.)

This rule "provides a trial court with discretion to order a party to submit to a physical or mental examination." *Burris*, 301 Mich App at 487. In general, "good cause" means a valid, sound, or satisfactory reason. *Id*. at 488. The trial court has broad discretion regarding what constitutes good cause. *Id*.

It is true that plaintiff-father has the genetic markers for HD which he inherited from his father, and, according to expert testimony, will develop symptoms at some point in the future. But the trial court's decision to not order a medical examination was not an abuse of discretion. Specifically, the trial court found that according to expert testimony, plaintiff-father was not exhibiting physical signs of HD, and was gainfully employed as a recreational therapist with no issues at work. The court acknowledged that plaintiff-father suffered from anxiety and depression but noted that according to Dr. Madosh, his anxiety and depression would not render him unable to function day to day, and he had no functional deficit that would interfere with his ability to carry on with regular tasks. Dr. Madosh said that she was familiar with the signs of HD and that she was not aware of plaintiff having any of those signs. She looked for some "first indicators" of HD when assessing him. She also said, "[W]e assessed specifically how his job function was, and there were no concerns or problems with his job." Dr. Madosh said that plaintiff did not need neuropsychological testing at this time. The trial court found Dr. Madosh's testimony "particularly compelling as to the central issues of this case" being plaintiff-father's PCP for several years, and that she was best suited to recommend testing given "the intimacy of the physician-patient relationship."

The trial court also noted that witness Dr. Justin Martello, a board-certified neurologist and psychiatrist with a specialty in movement disorders and HD, had no physician-patient relationship with plaintiff-father and never treated him in any capacity. Dr. Martello determined plaintiff-father already had HD on the basis of examining the DNA analysis report on plaintiff-father from 2008, and felt Dr. Madosh's observations and testing were not adequately thorough to address plaintiff-father's HD diagnosis. Dr. Martello concluded neuropsychological testing was necessary "so that a more complete picture can be gained as to how the disease . . . is affecting the person's life and to what extent." The trial court concluded that Dr. Martello likely "recommends a neuropsychological examination for everybody diagnosed with [HD], without exception, and regardless of whether they are demonstrating symptoms or deficits. . . . because Dr. Martello did not distinguish between those with [HD] who demonstrate symptoms and deficits versus those who do not."

Jessica Marsoleck, a social worker with the Huntington's Disease Society of America, testified that, once a person has genetic markers for HD, he or she does not need a neurological evaluation immediately but can wait for symptoms to appear. She said that a PCP could be the person giving guidance regarding whether symptoms are apparent. Marsoleck said that she had concerns about forcing a person with the genetic markers for HD "to undergo a neurological

evaluation against his or her will." She said that this was against the recommendations of her organization and HD experts. Marsoleck also said that a person having the genetic markers without symptoms could go "years" before having a neurological examination, depending on their functioning. She said that if a person is pre-symptomatic, a "neuropsych evaluation" would be unlikely to give much insight into a person's parenting ability.

Plaintiff-father testified that he did not believe he was in need of a medical examination and explained any anger, frustration, or irritability he displayed was attributable not to HD, but to being "deprived from seeing his children for a very long time." He worried testing for HD would unjustly jeopardize his employment. He testified he was willing to continue working with his PCP to monitor possible symptoms and to get an examination if recommended by her. Plaintiff-father said that his sister, friends, and counselor would also monitor him for symptoms. The trial court found plaintiff-father's testimony a "very valuable tool in enabling the [c]ourt to discern how he conducted himself under the rigors of cross-examination." The trial court observed:

> [D]efendant's counsel made a noticeable effort to agitate the plaintiff with an aggressive line of questioning and would then accuse the plaintiff of acting irritable or angry in response, as though to suggest that the plaintiff was demonstrating symptoms of [HD] in [] real-time.
>
> The [c]ourt does not fault defendant's counsel for doing his job in zealous fashion as he is ethically obligated to do. However, the [c]ourt's observation of the plaintiff's conduct during the cross-examination does not align with the defendant's narrative. The [c]ourt did not observe the plaintiff to become any more frustrated or oppositional, given the nature of the questioning, than any other reasonable or average person would have been under the same circumstances.

The court's conclusion that defendant-mother has not met her burden in proving good cause exists for ordering a medical examination at this particular point in time, was not an abuse of discretion. The court explained:

> the issue is not whether good cause exists to show merely that the parties disagree about the mental health of one party. Otherwise, all that would be needed to compel an examination would be one party accusing the other of being mentally ill or unsound. The issue, rather, is whether good cause exists to order the evaluation at all.

As the trial court observed, the record did not establish plaintiff-father had any physical symptoms of HD. Plaintiff-father maintained employment as a recreational therapist, a job that, trial court further observed:

> dictates that the plaintiff is trusted with the specific care of vulnerable individuals on a daily basis. There is nothing in the record to support or suggest that the plaintiff is in jeopardy of losing his job or that his performance as a recreational therapist is compromised in any way by [HD].

The court also reasoned plaintiff-father's anxiety, depression and irritability were borne out of the being separated from his children against his will and the "rather large number of [CPS]

investigations, none of which resulted in substantiated abuse or neglect." The court's reasoning is sound. No abuse of discretion is apparent.

## III. JUDICIAL BIAS

Defendant-mother contends that the trial judge displayed bias. We review claims of judicial bias de novo. *See In re Susser Estate*, 254 Mich App 232, 236; 657 NW2d 147 (2002). "A trial judge is presumed to be fair and impartial, and any litigant who would challenge this presumption bears a heavy burden to prove otherwise." *Id*. at 237. To overcome this presumption, the party claiming judicial bias must demonstrate that the trial court " 'display[ed] a deep-seated favoritism or antagonism that would make fair judgment impossible.' " *Eldred v Ziny*, 246 Mich App 142, 152; 631 NW2d 748 (2001), quoting *Cain v Dep't of Corrections*, 451 Mich 470, 496; 548 NW2d 210 (1996) (alteration in original). "A showing of prejudice usually requires that the source of the bias be in events or information outside the judicial proceeding." *In re MKK*, 286 Mich App 546, 566; 781 NW2d 132 (2009). A trial court's "rulings against a litigant, even if erroneous, do not themselves constitute bias or prejudice sufficient to establish a denial of due process . . . ." *In re Susser Estate*, 254 Mich App at 237.

We begin with the presumption that the trial court was impartial. *Id.* To evidence partiality, defendant-mother first takes issue with how the trial court treated an impeachment issue related to EG1's testimony. At the custody hearing, plaintiff-father's attorney asked EG1 whether she had told plaintiff-father in the past that defendant-mother had told her to say " 'bad stuff' " about plaintiff-father. When EG1 denied this, plaintiff-father's attorney played a video in which EG1 disclosed that she was being coached by defendant-mother. Defendant-mother's attorney did not object to this video recording being played, and asked whether EG1 knew she was being recorded. The following exchange occurred between defendant-mother's counsel and EG1 on redirect examination after the video was played:

> *Defendant-mother's Attorney:* [EG1], I got a question for ya [sic]. On that recording, it would be fortunate timing for your dad to be recording right when you're saying that.
>
> *Plaintiff-father's Attorney*: Objection to leading.
>
> *The Court*: And—and it's not even a question, it's a statement.
>
> *Defendant-mother's Attorney*: Well, I'll—I'll reform.
>
> *The Court*: So sustained.
>
> *Defendant-mother's Attorney*: Did your dad record you—did your dad record you—were you aware?
>
> *EG1*: No.

\* \* \*

*Defendant-mother's attorney*: When this alleged recording—because we don't even know if it's your voice, 'cause [sic] that's never been identified, number one, which is a requirement—do you know where the recording was?

*EG1*: Well, I could see the screen. It kinda [sic] looked like it was in his [truck].

After this exchange, when plaintiff-father's attorney attempted more questioning about whether EG1 saw herself in the video, defendant-mother's attorney objected on the basis of a failure to identify the voices in the recording. In response to the objection, the trial court stated: "[T]he record established rather clearly that she's acknowledging that the voice was hers." Defendant-mother's counsel noted on the record that he believed the trial court's failure to sustain his objection was prejudicial. On appeal, defendant-mother argues the trial court erred by allowing plaintiff-father's attorney to continue questioning EG1 about whether she was speaking in the video. Having reviewed the above exchange between defendant-mother's counsel and EG1, we do not believe EG1's statements, taken together, "clearly established" she was speaking in the video. Nevertheless, we also observe some ways in which defendant-mother's own attorney furthered the authentication process, for example, by making the following statement to EG1: "On that recording, it would be fortunate timing for your dad to be recording right *when you're saying that*." (Emphasis added.) Even if this was ultimately error by the trial court on an evidentiary issue, that error does not amount to judicial bias. *See In re MKK*, 286 Mich App at 566 ("Disqualification on the basis of bias or prejudice cannot be established merely by repeated rulings against a litigant, even if the rulings are erroneous.").

Defendant-mother also argues on appeal that the trial court should not have asked EG1 about the voices on the recording, which the trial court ultimately did following the aforementioned exchange. Defendant-mother contends that the trial court improperly stepped into the role of authenticating the recording. Defendant-mother also points to the trial judge extensively questioning defendant-mother and FG as well, and contends that the judge crossed the line into cross-examination.

Under MRE 614(b), the trial court may examine a witness regardless of who calls the witness, and under MRE 614(c), a party may object to the court's examining a witness. In *People v Stevens*, 498 Mich 162, 173; 869 NW2d 233 (2015) (citation omitted),[2] this Court has stated that: "the central object of judicial questioning should be to clarify. Therefore, it is appropriate for a judge to question witnesses to produce fuller and more exact testimony or elicit additional relevant information." A judge must maintain a proper tone and not express disbelief or belief of a witness. *Id*. at 174-176.

It is true that the judge asked many questions of defendant-mother, EG1, and FG. But the judge was the finder of fact for the bench trial, and the parties were making contradictory allegations. Plaintiff-father was contending that he had never been abusive toward his children and that defendant-mother had "brainwashed" them, alienated them, and coached them into

---

[2] The defendant in *Stevens* was tried by a jury, *Stevens*, 498 Mich at 164, whereas here there was a bench trial.

making false accusations, whereas the children were contending that plaintiff-father *had* abused them. The trial court gathered as much information as possible to get to the bottom of this credibility contest.

The trial court stated as much in response to defendant-mother's attorney objecting to the trial judge stating he would question EG1 about the video: "And what if the finder of fact, that being myself, wants some clarification on this very point, and I wanna [sic] ask your witness some questions about it?" Defendant-mother's attorney argued in response that the trial judge had "already foregone asking questions . . . ," and under MRE 611, the trial judge missed its opportunity to ask EG1 questions. But under MRE 611, there is no provision on when the time for the trial judge to question witnesses has passed. Rather, MRE 611(a) allows the trial court to "exercise reasonable control over the mode and order of examining witnesses and presenting evidence so as to: (1) make those procedures effective for determining the truth." We see no favoritism or antagonism of any particular party or witness here that would rise to the level of judicial bias. *Eldred*, 246 Mich App at 152; quoting *Cain*, 451 Mich at 496.

As additional evidence of judicial impartiality, defendant-mother contends that the judge was aggressive toward and biased against defendant-mother's attorney. After defendant-mother's attorney stated the time for the trial court to question EG1 had passed, the trial court asked for a statute, a court rule, or a rule of evidence that said so. Defendant-mother's attorney presented its argument under MRE 611, and the following exchange occurred:

> *Defendant-Mother's Attorney:* You've established the mode of interrogation saying it's—this—this is the banter that's getting ready to go back on and forth, which I'm not willing to engage in. You can make your ruling, you can move forward, and we don't need to engage in the banter.
>
> *The Court:* Well, this is banter because, [counsel], you're not letting it go.
>
> *Defendant-Mother's Attorney:* No. No. I—I—I have to basically make a record of this.
>
> *The Court:* Listen—
>
> *Defendant-Mother's Attorney:* So what you're saying is—
>
> *The Court:* [Counsel], the mode of interrogation that I've conducted throughout this trial that you've been in this room for has involved giving counsel an exhaustive opportunity to ask their questions, and when counsel has been done, then I have asked questions and then when I've been done asking questions, I've been giving counsel a follow-up opportunity to ask questions just in case my questions brought up something that due process requires a follow-up on. I have not taken the liberty yet to ask one question to [EG1], have I?
>
> *Defendant-Mother's Attorney:* I—I—see again, see—it's the aggressiveness that's happening.

*The Court:* Stop with the aggressiveness, [Counsel]. . . . My—my voice is elevated at this point so I can communicate a point to you—

*Defendant-Mother's Attorney:* Right.

*The Court:* —because you're not understanding the point.

*Defendant-Mother's Attorney:* So—so no. No. I am understanding and you're trying to dictate the point.

*The Court:* Let me—

*Defendant-Mother's Attorney:* And again—

*The Court:* —ask something—

*Defendant-Mother's Attorney:* —all I'm saying is—

*The Court:* Well, now you're interrupting me. That's aggressiveness.

Although the hearing was clearly contentious, among the parties themselves and the lawyers and judge, there is no clear indication of bias toward defendant-mother's counsel. The judge made sure the record reflected his elevated voice was used to gain control of his courtroom. Right after this exchange, the judge asked the children's guardian ad litem and plaintiff-father's attorney to weigh in on the judge's behavior and whether he was being aggressive. But this seemed to be a genuine "pulse check" rather than vindictive passive aggressiveness as it followed defendant-mother's attorney accusing the judge of "aggressiveness" and of "trying to dictate [a] point." When asked, the attorneys said that the judge was not being aggressive. Defendant-mother's attorney responded: "I don't think we measure by what other people find aggressive. I think what we do is we measure how I'm perceiving it and I perceive it as you being aggressive . . . But this is the banter. I don't want the banter. All I want is your ruling. Rule . . . then move forward."

The disagreements between defendant-mother's attorney and the judge did hit a crescendo following this accusation. The judge accused defendant-mother's attorney of "gaslighting in live time in the courtroom." The judge said, "[You are] projecting to me qualities that you've demonstrated throughout this trial with your behavior, whether it's interrupting witnesses, interrupting counsel, or taking over the courtroom like a judge yourself telling people when to talk and when not to speak." The judge noted that he had "exercised a great amount of temperance" and "haven't tried to create a record every time that you've conducted yourself in a manner that falls beneath the dignity of your position as counsel of record." But "a trial judge's remarks made during trial, which are critical of or hostile to counsel, the parties, or their cases, ordinarily do not establish disqualifying bias." *In re MKK*, 286 Mich App at 567. "Under MCR 2.003(C)(1)(b), the test . . . is whether the conduct would create in reasonable minds a perception that the judge's ability to carry out judicial responsibilities with integrity, impartiality and competence is impaired." *Kern v Kern-Koskela*, 320 Mich App 212, 232; 905 NW2d 453 (2017) (quotation marks and citation omitted). Although frustration from the judge is apparent, it seems the

underlying motivation is a deeply held belief in integrity and competence. As a result, no judicial bias is apparent from these interactions.

Defendant-mother's final example of alleged judicial bias is that the judge improperly placed time constraints on the presentation of evidence at the custody hearing. But, "MRE 611 grants a trial court broad power to control the manner in which a trial is conducted, including the examination of witnesses." *Hartland Twp v Kucykowicz*, 189 Mich App 591, 595; 474 NW2d 306 (1991). Specifically, MRE 611(a)(2) allows the trial court to control the mode and order of examining witnesses so as to "avoid wasting time[.]" The custody case had been ongoing for a very long period, with plaintiff-father having no access to his children. The court was concerned with reaching a resolution. Both sides presented a plethora of evidence. In addition, and most importantly, defendant-mother does not demonstrate how she was prejudiced from the time constraints. Under these circumstances, the time constraints implemented by the court do not bolster defendant-mother's argument regarding judicial bias.

## IV. FINAL CUSTODY ORDER

Defendant-mother takes issue with some of the trial court's findings in its custody order and contends that the trial court erred by awarding plaintiff-father sole legal custody and ordering that the children attend the Marquette Public Schools. She does not take issue with the trial court's parenting-time award.

MCL 722.28 guides our review of the trial court's findings of fact relating to the final custody order, and states:

> To expedite the resolution of a child custody dispute by prompt and final adjudication, all orders and judgments of the circuit court shall be affirmed on appeal unless the trial judge made findings of fact against the great weight of evidence or committed a palpable abuse of discretion or a clear legal error on a major issue.

*Vodvarka v Grasmeyer*, 259 Mich App 499, 507-508; 675 NW2d 847 (2003) (quotation marks and citations omitted), states the three standards of review applicable to custody appeals:

> [This Court] appl[ies] three standards of review in custody cases. The great weight of the evidence standard applies to all findings of fact. A trial court's findings regarding the existence of an established custodial environment and regarding each custody factor should be affirmed unless the evidence clearly preponderates in the opposite direction. An abuse of discretion standard applies to the trial court's discretionary rulings such as custody decisions. Questions of law are reviewed for clear legal error. A trial court commits clear legal error when it incorrectly chooses, interprets, or applies the law.

A trial court may modify or amend its previous child custody orders for proper cause or because of a change of circumstances, and cannot change the established custodial environment of a child unless there is clear and convincing evidence presented that such a change is in the best interests of the child. MCL 722.27(1)(c). "The custodial environment of a child is established if over an appreciable time the child naturally looks to the custodian in that environment for

guidance, discipline, the necessities of life, and parental comfort." *Id*. Here, before considering whether changing the custody arrangement would be in the best interests of the children, the trial court properly determined their established custodial environment was with defendant-mother even though that was in large part because she actively deprived the children of parenting time with plaintiff-father. Then, the trial court considered the best interests of the children.

1. BEST INTERESTS OF THE CHILDREN

Under MCL 722.23, the "best interests of the child[ren]" are determined by the trial court considering, evaluating, and determining the sum total of the following factors:

(a) The love, affection, and other emotional ties existing between the parties involved and the child.

(b) The capacity and disposition of the parties involved to give the child love, affection, and guidance and to continue the education and raising of the child in his or her religion or creed, if any.

(c) The capacity and disposition of the parties involved to provide the child with food, clothing, medical care or other remedial care recognized and permitted under the laws of this state in place of medical care, and other material needs.

(d) The length of time the child has lived in a stable, satisfactory environment, and the desirability of maintaining continuity.

(e) The permanence, as a family unit, of the existing or proposed custodial home or homes.

(f) The moral fitness of the parties involved.

(g) The mental and physical health of the parties involved.

(h) The home, school, and community record of the child.

(i) The reasonable preference of the child, if the court considers the child to be of sufficient age to express preference.

(j) The willingness and ability of each of the parties to facilitate and encourage a close and continuing parent-child relationship between the child and the other parent or the child and the parents. A court may not consider negatively for the purposes of this factor any reasonable action taken by a parent to protect a child or that parent from sexual assault or domestic violence by the child's other parent.

(k) Domestic violence, regardless of whether the violence was directed against or witnessed by the child.

(*l*) Any other factor considered by the court to be relevant to a particular child custody dispute.

"The burden of establishing clear and convincing evidence that a change of custody is in the best interests of the child is on the party moving for a change of custody," in this case, defendant-mother. *Treutle v Treutle*, 197 Mich App 690, 692; 495 NW2d 836 (1992).

Defendant-mother mentions an alleged error with the court's analysis of factor (a) but, in the substance of her argument, refers to the statutory language of and the court's findings under factor (b). Even though the trial court found both factors (a) and (b) favored defendant-mother, she appears to be contending that the trial court should not have concluded that defendant-mother caused the children to be estranged from plaintiff-father. She contends that there was insufficient evidence of parental alienation.

However, the trial court's finding that defendant-mother had inappropriately alienated the children from plaintiff-father is supported by the record. Gina Krueger, plaintiff-father's sister, said that she used to see the children regularly with plaintiff-father but that she had not seen them since the summer of 2022. Krueger said that she had never seen inappropriate interactions between plaintiff-father and the children, and that the children were "always very happy to be with him." She said that plaintiff-father was "very interactive" with them and loving toward them. Krueger did not have concerns about plaintiff-father's judgment, insight, or ability to empathize.

Plaintiff-father testified that he had not seen his children since July 2022, a span of almost two years.[3] He said that, since their 2017 divorce, he and defendant-mother had shared legal and physical custody. In approximately 2019, the parties began a week-on/week-off parenting-time schedule. This continued until 2022, when defendant-mother stopped following the schedule and also began keeping the children from school. Plaintiff-father said that there had been many court hearings, with many people working to devise parenting-time-exchange plans for the children, but "every single time [defendant-mother] . . . never followed it and was in contempt of court." He testified defendant-mother "manipulated" the children and "sabotaged" exchanges. He indicated that defendant-mother "wouldn't get out of the car," would "lock her car doors," and would not make any attempts to get the children out of their carseats or the car. And at times she would lock her car doors and drive away with the children. She would tell the children that they did not have to "go to Dad's if you don't want to."

Plaintiff-father also testified that defendant-mother never discussed homeschooling with him. He had attempted to get the children back in school and had tried to get the prosecutor involved regarding truancy. Plaintiff-father stated the children never had any issues with attending the Marquette Public Schools, and did not know whether the children were properly "engaged in a homeschooling program." Defendant-mother did not provide him with medical or dental information regarding the children. Plaintiff-father said that, when he has had the children in the past, he allowed them to communicate with defendant-mother by way of telephone. But when they were in defendant-mother's care, he was never allowed to speak with them. Plaintiff-father

---

[3] The custody hearing took place in the spring of 2024.

said that he calls and texts every day, but defendant-mother does not allow him to speak with the children.

A police detective and CPS investigator looked into an allegation against plaintiff-father of sexual abuse of EG2. All three children as well as plaintiff-father were interviewed, and no evidence of such abuse was found. The investigators found nothing concerning about the behavior of EG2 or any of the other children. The outcome of a safety assessment was that the children were safe with plaintiff-father. Other CPS complaints had also been unsubstantiated.

Another CPS investigation occurred in 2018 about a bruise on FG which allegedly came from plaintiff-father. The disclosure had come from EG1, but the investigator questioned EG1's truthfulness because she changed her story throughout the investigation. The allegation was not substantiated. The CPS investigator said that EG1 appeared comfortable with plaintiff-father. The investigator witnessed an exchange and testified plaintiff-father acted appropriately, but it appeared that defendant-mother had been telling EG1 what to say. The investigator was involved somewhat in an investigation of another allegation in 2019. The allegation was not substantiated, and EG1 seemed fine in plaintiff's care. On the basis of all these facts presented to the trial court, there was clear and convincing evidence of both coaching and parental alienation in the record.

Defendant-mother also contends that there was no evidence that plaintiff-father could provide the children with structure, routine, and discipline. But this conclusion by the trial court was adequately supported by the evidence. Plaintiff-father was gainfully employed as a recreational therapist, with 20 years of work experience in a hospital setting, and it was established that he was not exhibiting any symptoms of HD. He desired for the children to attend public school so they could be socialized with children their age, and was concerned about their religious education. Before defendant-mother restricted him from seeing the children, plaintiff-father never prevented her from exercising parenting time. Plaintiff-father was also very bonded with the children before his parenting time was restricted—the testimony established they were happy in his presence, they enjoyed outdoor activities together, and he transported them to school events and activities.

Defendant-mother next argues about factor (c), but instead appears to be taking issue with the court's findings on factor (d), contending that the trial court should have believed the children regarding abuse.[4] But the trial court is the assessor of credibility, *Wright v Wright*, 279 Mich App 291, 299; 761 NW2d 443 (2008), and found the testimony from CPS and police investigators was credible, and that evidence of abuse, if any, failed to meet a preponderance standard. The trial court found the children's inability to recall dates or details of alleged abuse called into question their truthfulness—EG1's claim that her father hit her 20 times a day every day for seven years, absent any record of photographs or injuries, or any reports to CPS of EG1's injuries, caused the trial court to doubt EG1's credibility and believe the children were being manipulated by defendant-mother. We decline to disturb that credibility determination. Defendant-mother also argues that her home is more stable than plaintiff-father's because plaintiff-father has HD, but as discussed earlier in this opinion, the record indicates plaintiff-father is not yet showing symptoms of HD. Defendant-mother additionally contends that the trial court should have put limited weight

---

[4] The court analyzed the abuse claims in connection with factor (d).

on testimony from plaintiff-father's witnesses, but again, it was the trial court's role to assess weight and credibility. *Id.* ("Because this case was heard as a bench trial, the court was obligated to determine the weight and credibility of the evidence presented.").

Regarding factor (f), defendant-mother contends that the trial court should have weighed this factor in favor of her because plaintiff-father had many moral failings. But the trial court rejected as not credible the allegations of abuse. And there was adequate evidence, as noted, of defendant-mother's engagement in parental alienation. As for factor (g), defendant-mother contends that plaintiff-father clearly is in poorer health than defendant-mother on the basis of HD. But again, after a lengthy hearing on whether plaintiff-father should submit to a medical examination, it was determined he is not yet symptomatic and there was no good cause to order such an examination, and his depression and anxiety were instead a result of being alienated from his children for almost two years.

As for factor (h), defendant-mother contends that the trial court should have taken into account that she has primary physical custody in Escanaba and that the children do not want to attend the Marquette Public Schools. She alleges that the schooling decision was improper. But the trial court properly noted that the children had been doing well in the Marquette Public Schools and were improperly removed from those schools by defendant-mother. The trial court also noted that the guardian ad litem, who represented the children, was in favor of the children attending the Marquette Public Schools, and there was no evidence on the record as to whether the move to homeschooling benefited the children in any way above what their public-school enrollment offered. No error is apparent.

Defendant-mother contends that the trial court did not properly consider the children's preferences under factor (i). But the court clearly stated in its findings of fact and conclusions of law that it conducted an in-camera interview of all three children, wherein each child expressed a preference, and the trial court stated it *was* considering the children's preferences in making a decision on changing the custody order. Even though EG1 and FG testified they did not have positive experiences with their father, as mentioned above, the trial court did not find their testimony credible and did find that they were being manipulated by defendant-mother. Again, we decline to disturb this credibility determination.

Defendant-mother contends that, with regard to factor (j), the court's findings were improper because defendant-mother, in keeping the children away from plaintiff-father, was protecting them from abuse. Again, based on this record, we find no error in the trial court's finding that the allegations of abuse were not credible. *Wright*, 297 Mich App at 299. Regarding factor (k), defendant-mother contends that the trial court should have taken into consideration plaintiff-father's domestic violence, but the trial court properly cited record evidence (namely, plaintiff-father's testimony) in support of its conclusion that domestic violence was not an issue in the case.

Defendant's arguments on appeal are largely rooted in credibility and weight, which were the province of the trial court, *id.*, and we find no error in the trial court's fact-finding or application of the law as to the best-interest factors. Defendant-mother next takes issue with the trial court's ultimate conclusions as to custody after analyzing the best interests of the children.

## 2. CHANGE OF LEGAL CUSTODY

Defendant-mother contends that it was contradictory for the trial court to have awarded her primary physical custody but plaintiff-father sole legal custody. We disagree.

It is important to first understand the different custody arrangements available. MCL 722.26a(7) defines joint custody, and states "joint custody" means an order of the court in which one or both of the following is specified: "(a) That the child shall reside alternately for specific periods with each of the parents . . ." and "(b) That the parents shall share decision-making authority as to the important decisions affecting the welfare of the child." Regarding defendant-mother's challenge to the order separating physical custody from legal custody, in *Dailey v Kloenhamer*, 291 Mich App 660, 670; 811 NW2d 501 (2011), this Court stated:

> The statute clearly provides that a trial court's custody order may specify "1 or both"—physical custody or legal custody. MCL 722.26a(7). The "1 or both" provision specifically authorizes a court to order that the child reside alternately with each parent and to also order that only one parent has "decision-making authority as to important decisions affecting the welfare of the child." MCL 722.26a(7). Moreover, the act itself states that it "is equitable in nature and shall be liberally construed and applied to establish promptly the rights of the child and the rights and duties of the parties involved." MCL 722.26(1). Given the plain language of the joint-custody provisions and the equitable nature of the act, we hold that the act authorizes courts in proper circumstances to grant joint physical custody to the parties while granting sole legal custody to one party.

In this case, the children had been alienated from plaintiff-father for years. The trial court concluded that it was best that they spend the majority of their time with defendant-mother because the factual findings did not establish by clear and convincing evidence that a change of the children's established physical custodial environment would serve their best interests. Thus, defendant-mother retained primary physical custody. But the court phased in considerable parenting time for plaintiff-father. The court was also faced with the problem of defendant-mother having interfered with plaintiff-father's ability to act as a parent for two years. It was reasonable, therefore, for the court to conclude that joint legal custody was not feasible and that plaintiff-father should be the one to retain legal custody so he could make decisions on the children's schooling, medical care, and religious education. As stated in *Berger v Berger*, 277 Mich App 700, 712; 747 NW2d 336 (2008), "the trial court need not make its custody determination on the basis of a mathematical calculation and may assign differing weights to the various best-interest factors." Even if defendant-mother was "favored" on more factors than plaintiff-father, the salient issues in terms of *legal custody* were the alienation issues and failure to include plaintiff-father in decision-making. The trial court could have been more explicit in setting forth precisely which factors favored awarding sole legal custody to plaintiff-father, but in our view, the court's reasoning is sufficiently apparent from reading its opinion as a whole, and the decision is adequately rooted in the evidence. This new custody arrangement does not fall outside the range of principled outcomes.

## V. CONCLUSION

We affirm the order denying defendant-mother's request for a medical examination of plaintiff-father, and affirm the order changing parenting-time schedules of the parties and awarding sole legal custody to plaintiff-father.

/s/ Philip P. Mariani
/s/ Allie Greenleaf Maldonado
/s/ Adrienne N. Young